**Carlo BORDONI, Plaintiff,**

v.

**WASHINGTON POST COMPANY et al., Defendants.**

**No. 74 Civ. 3169.**

United States District Court,
S. D. New York.

July 15, 1975.

---

16. *Tracy v. Newsday, Inc.*, 5 N.Y.2d at 136, 182 N.Y.S.2d 1, 155 N.E.2d 853.

17. *Id.* at 137, 182 N.Y.S.2d 1, 155 N.E.2d 853.

DiFalco, Field & O'Rourke, New York City, for plaintiff; David A. Field, Walter M. Schwartz, Barton P. Blumberg, New York City, of counsel.

Williams, Connolly & Califano, Washington, D. C., for defendants; Joseph A. Califano, Jr., Vincent J. Fuller, Richard M. Cooper, Washington D. C., of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

This is another of four libel actions commenced by plaintiff based upon articles concerning the affairs of the Franklin National Bank ("Bank"), which refer to plaintiff's relationship to, and resignation as a director of, the Franklin New York Corporation ("Franklin"), the Bank's parent. The defendants in this case are the Washington Post Company, B. C. Bradlee, its Executive Editor, and Jack Egan, the reporter who wrote the alleged libelous articles.

Reference is made to and familiarity assumed with this court's opinion filed this day in plaintiff's action against the New York Times,[1] since the parties

1. *Bordoni v. New York Times Co.*, D.C., 400 F.Supp. 1223.

agree that New York law is also applicable here. While the substance of the articles in this case parallels that of the New York Times article, the articles differ in language in some respects and must therefore be examined and passed upon independently.

At issue in this case are two articles published by the Washington Post, one on June 22 and the other on June 26, 1974. Here, as in the New York Times case, plaintiff, without pleading special damages, alleges the articles are libelous per se because they (1) cast aspersions upon him in his calling, and (2) charge that he engaged in criminal conduct. Here, too, as to each publication, four separate claims are advanced. Three, those that charge plaintiff was libelled in his calling as an expert in international monetary and banking affairs, do not rely upon an innuendo; the remaining claim, which charges the articles meant and were understood to mean that he had violated federal laws, relies upon an innuendo. The defendants in the instant case move for judgment on the pleadings on the ground that the complaint fails to state a claim upon which relief can be granted.

### The June 22 Article—Claims 1 through 4

The article, headed "Merger Plan For Franklin Far Advanced," begins by stating that efforts are far advanced to merge "financially troubled" Franklin National Bank with another New York bank or with a major English financial institution; that "the major matter that needs to be cleared up is whether the Federal Deposit Insurance Corporation would assume substantial risk for all potential losses that have not yet been uncovered." The article then continues:

> "On Thursday, Franklin National, 20th largest in the country, reported it lost $63 million in the first five months of the year, with $45.8 million attributed to foreign exchange speculation, most of it unauthorized, according to the bank."

The next three paragraphs describe the nature of the contemplated merger, name banks interested in the merger, and state that "[i]n order to restore confidence in the bank, any arrangement would entirely remove mysterious Italian financier Michele Sindona—now Franklins [sic] major shareholder—from the scene, according to the source." Plaintiff is not mentioned by name until the seventh paragraph, and thereafter in the eighth, ninth and tenth, as follows:

> "It was also learned yesterday that Carlo Bordoni, a director of Franklin New York Corp., holding company for the bank, resigned at the board's request on Thursday although this has not been publicly announced.

> "Bordoni, a Sindona intimate and involved in multiple business enterprises in Sindona's far-flung financial web, was formerly a foreign exchange trader with an international reputation for the scale of his speculation.

> "Bordoni has been credited with organizing Franklin's foreign exchange department when Sindona purchased 22 percent of the bank's stock in 1972 and introducing his own style of high volume foreign exchange speculation.

> "Bordoni's exit follows the firing of a foreign exchange trader who [sic] the bank charged with falsifying records and hiding transactions. In addition, the head foreign exchange trader for Franklin and the executive vice-chairman in charge of this area resigned."

The article then refers to the resignation of the Bank's chairman and chief executive officer in the wake of a financial statement detailing the Bank's losses, discusses merger prospects, and observes that the Federal Reserve Board "is known to be reluctant to approve a situation where Sindona through Fasco [Sindona's personal holding company] would be the holding company in control of the bank."

■ We first consider plaintiff's three claims that he has been disparaged in his business calling, as to which no innuendo is relied upon. The opening statement, that plaintiff resigned as a director at the Board's request, by itself carries no imputation of lack of integrity, nor does it cast aspersions upon his professional competence. The article does not suggest that the request was based upon any misconduct, incompetence or shortcoming.[2]

■ The next paragraph quoted above, which describes Bordoni's intimate association with Sindona in vast financial enterprises and states that Bordoni was formerly a foreign-exchange trader with an international reputation for the scale of his speculation in foreign-exchange, does not reflect upon his professional competency or integrity. Close relationship with another who is engaged in multiple business enterprises or in a "far-flung financial web" does not cast aspersion upon one in his business life. So, too, that one has an international reputation for the scale of his speculation in foreign exchange does not denigrate his business stature. Speculation is a legitimate activity engaged in by many, whether in stocks, bonds, futures, commodities or foreign exchange.[3] Absent a charge of illegal or reprehensible conduct or incompetence, such activity does not reflect upon one's professional standing.[4] No such charge is made.

■ The following paragraph states that Bordoni organized Franklin's foreign exchange department and introduced his own style of high volume foreign-exchange speculation. Responsibility for introducing a policy of foreign-exchange speculation by itself does not disparage one in his calling. The article nowhere suggests that the introduction of the foreign-exchange program was achieved or accompanied by improper conduct or dishonesty.

Plaintiff, however, argues that the earlier reference to the heavy losses "attributed to foreign exchange speculation, most of it unauthorized, according to the bank," when read together with the statement of Bordoni's "introducing his own style of high volume foreign exchange speculation," implies that the losses are attributable to him and thereby reflect upon his professional competence. But the language of the article taken alone contains no such charge, and no such innuendo is pleaded.[5] Indeed, even if such an innuendo were pleaded, it would be unwarranted.[6] The article neither states nor implies that plaintiff's activities as a Bank director, or his organization of the foreign exchange department, were the cause of the Bank's losses. Introduction of a style of action is one matter; its implementation is another. The article nowhere suggests that once the foreign exchange department was organized, Bordoni participated in any of the transactions which resulted in the losses. Indeed, the statement that most of the foreign-exchange speculation was unauthorized points in another direction, particularly when considered with the reference to the discharge of the foreign-exchange trader whom the Bank charged with

2. *Cf. Nichols v. Item Publishers, Inc.,* 309 N.Y. 596, 132 N.E.2d 860 (1956); *Loudin v. Mohawk Airlines, Inc.,* 27 A.D.2d 517, 275 N.Y.S.2d 359 (1st Dep't 1966); *Smith v. Staten Island Advance Co.,* 194 Misc. 299, 87 N.Y.S.2d 847 (Sup.Ct.1949), *aff'd,* 276 App.Div. 978, 95 N.Y.S.2d 188 (2d Dep't 1950).

3. *Labouisse v. Evening Post Pub. Co.,* 10 App.Div. 30, 41 N.Y.S. 688, 690 (1896).

4. One who was the trusted adviser to five Presidents and enjoyed a national and international reputation disavowed the title of banker and accepted that of speculator, which he defined as one "who observes the future and acts before it occurs." B. Baruch, *Baruch: My Own Story* 105, 247–49, 260 (1957); B. Baruch, *Baruch: The Public Years* 25, 31, 49, 220 (1960).

5. *Bordoni v. New York Times Co.,* 74 Civ. 3168 at 11 n. 9.

6. *See Tracy v. Newsday, Inc.,* 5 N.Y.2d 134, 136–37, 182 N.Y.S.2d 1, 3–4, 155 N.E.2d 853 (1959).

falsifying records and hiding transactions.

Thus the court concludes that a fair reading of the article in context, giving full import to those portions which mention the plaintiff, does not justify the three claims that the article is libelous per se. Moreover, the defect in those claims would not be cured by an allegation of innuendo that plaintiff was responsible for the foreign-exchange losses.

The fourth claim, which relies upon an innuendo that the article charged Bordoni with violation of federal criminal laws, will be considered with the same claim as to the June 26th article, since the claims are pleaded in haec verba.

### The June 26th Article—Claims 5 through 8

This article is headed "Deals Aimed at Profits For Franklin." The first eleven of the sixteen paragraphs of the article make no reference to Bordoni. They begin by reporting a statement by federal investigators that Sindona "may have directed foreign exchange transactions to Franklin in 1973 and early 1974 from other foreign banks he controls in order to guarantee a profit for Franklin." After referring to the losses during the first five months of 1974, attributed "almost exclusively to unauthorized trading and falsified transactions," as independent of the "profitable foreign exchange business directed to Franklin," the article continues:

"The source said that the foreign exchange trades set up for Franklin with other Sindona business interests earned the bank an automatic profit because the transactions took place at a favorable rate independent of the actual foreign exchange market rate.

"He added that there might be nothing illegal in any of this as far as Franklin is concerned, but said he did not know if the parties involved on the other side of the foreign exchange trades with Franklin lost money or offset potential losses with other currency transactions."

Then follows a description of foreign-exchange trading:

"Foreign exchange transactions are basically speculations on the future movements of currencies. A trader will buy for future delivery of a currency at a set price in the hopes that it will go up. He will sell a currency with a future delivery in the expectation it will go down. In either case, he makes a profit. If a currency moves contrary to expectations, it produces a loss.

One top bank regulatory official today said foreign currency speculation was 'like shooting craps.' "

The article continues that the Bank earned $7.75 million in foreign exchange in the previous year [1973], approximately sixty per cent of the Bank's profits for the year, and that the "SEC and the Comptroller of the Currency are investigating how much of [those profits] are the result of business deliberately shunted Franklin's way by Sindona's other banks and business interests."

The first mention of Bordoni is in the twelfth paragraph, followed by reference to him in the next three, as follows:

"The source confirmed that the Comptroller was looking into the involvement of Carlo Bordoni in Franklin's foreign exchange operations but said this was not related to misevaluations of transactions related to recent losses.

"Bordoni, a former foreign exchange trader who is involved in many of Sindona's business enterprises, including the Milanese banks, was put on the board of Franklin New York Corp., holding company for the bank, in 1972. He resigned from the board last Thursday with no reason given.

"Bordoni today denied he resigned at the request of the Franklin board

and said he was not involved in the foreign currency transactions which led to the Franklin losses, Dow Jones News Service reported.

"Bordoni is credited with organizing Franklin's foreign exchange operations in 1972 and introducing the high-volume speculative style he has been noted for, and which some observers feel got the bank into trouble.

"An investigation by the Comptroller into whether possible fraud was involved in the recent foreign exchange losses is continuing, according to a source, and includes everyone 'from the newest employee to the top of the bank.' The investigation into the whole foreign currency matter by the Comptroller is expected to wind up next week."

Plaintiff here, too, asserts four separate claims: in three, that the article defames him in his calling, and in the remaining claim, where he relies upon an innuendo, that it implies he violated federal criminal laws.

■ As in the instance of the June 22 article, plaintiff urges that since the article was intended to make an impact upon the business community, the court should interpret it as a banker, businessman and professional would interpret it.[7] So viewing it, and considering the article in its entirety and giving words their normal and rational meaning, the article is not libelous per se. Plaintiff points to no specific items in the article which support his charge that they impugn his competency, honesty or integrity in his professional calling. The references to his being a former foreign-exchange trader, his association with Sindona enterprises, his requested resignation, his organization of Franklin's foreign exchange operation, and his introduction of "the high-volume speculative style he has been noted for," are no more defamatory than the substantially similar statements in the June 22 article. The added reference that some observers felt that the high volume speculative style he introduced "got the bank into trouble" is not by itself libelous per se. As already noted, the article does not state or imply that following the establishment of the policy, Bordoni played any role in any of the foreign-exchange transactions which resulted in the losses. There is, of course, no assurance of success in any market purchase, and the fact that losses are sustained in the execution of a program does not stamp the initiator as incompetent in his calling.

■ So, too, the references to the Comptroller General's "looking into" Bordoni's involvement in Franklin's foreign-exchange operations, and to a continuing investigation by the Comptroller into possible fraud in connection with the recent foreign-exchange losses, which investigation included everyone "from the newest employee to the top of the bank," do not cast aspersions upon the plaintiff in his business calling. The Comptroller was engaged in the performance of his duties, and a statement as to the scope of his inquiry and those who may come within its embrace, without more, does not impugn plaintiff's business competency or integrity.[8] Moreover, the article contains no statement that Bordoni is charged with a crime or that charges against him are under consideration. To hold libelous per se a statement that an authorized agency was "looking into" Bordoni's involvement in Franklin's foreign-exchange operations, the proper subject of official inquiry, would result in sterile news reporting.

7. Citing *Sullivan v. Daily Mirror, Inc.*, 232 App.Div. 507, 250 N.Y.S. 420, 424 (1st Dep't 1931).

8. *See* Seelman, *The Law of Libel and Slander* 110 nn. 228, 229 (1964).

**1236**

The court concludes that the three claims which allege the article is libelous per se in that it reflects upon plaintiff's business competency and integrity afford no basis for relief and must be dismissed.

■ The remaining claim based upon the June 26th article alleges in haec verba the innuendo advanced with respect to the June 22nd article—that by the article the defendants meant and were understood by persons reading it to mean that Bordoni had participated in criminal acts in violation of federal banking and other laws, including disclosure requirements to which public and banking corporations such as Franklin and the Bank are subject. There is nothing in either article which justifies the asserted innuendo or that is capable of the meaning plaintiff ascribes to it. As indicated above, there is no charge that plaintiff or any other person violated the federal banking laws, failed to make disclosures required by law, engaged in criminal conduct, or even was suspected of having engaged in criminal conduct. There is no suggestion, much less any statement, that Bordoni had any responsibility for Franklin's compliance with the disclosure laws. To infer that the articles charged plaintiff with participating in criminal acts is to enlarge impermissibly upon the plain meaning of the language used. In the instance of these articles, as in that of the New York Times case, where the same innuendo was pleaded, the conclusion is compelled that " 'the pleaded innuendo is strained, unreasonable and unjustified.' It does not explain any statement in the article, but adds an entirely new and independent thought that finds no support in the article."[9]

The defendants' motion to dismiss the complaint for failure to state a claim is granted.

---

9. *Tracy v. Newsday, Inc.,* 5 N.Y.2d at 137, 182 N.Y.S.2d at 4, 155 N.E.2d 853.