**Carlo BORDONI, Plaintiff,**

v.

**NEW YORK TIMES COMPANY, INC., et al., Defendants.**

**No. 74 Civ. 3168.**

United States District Court, S. D. New York.

July 15, 1975.

1224

DiFalco, Field & O'Rourke, New York City, for plaintiff; David A. Field, Walter M. Schwartz, Barton P. Blumberg, New York City, of counsel.

Cahill Gordon & Reindel, New York City, for defendants; Floyd Abrams, Dean Ringel, Stacy J. Haigney, New York City, of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

This is one of four actions commenced by Carlo Bordoni against various publications charging that he was falsely

libelled by news articles concerning the affairs of the Franklin National Bank ("Bank"), which, among other matters, described the circumstances of plaintiff's resignation as a director of Franklin New York Corporation ("Franklin"), the Bank's parent. The defendants in this case are the New York Times, A. M. Rosenthal, its managing editor, and John H. Allan, the reporter who wrote the alleged libelous article.

Plaintiff's complaint alleges he is an acknowledged international monetary, banking and financial expert. It sets forth four separate claims, none of which pleads special damages; rather, plaintiff relies upon allegations that the article in question is libelous per se and is actionable even without an allegation of special damages. The defendants move to dismiss the complaint on the grounds that (1) no statement defamatory of plaintiff is contained in the article, and (2) even if such a statement is found therein, under New York's "single-instance" rule the complaint is deficient because of its failure to plead special damages.[1] Thus the essential question is whether the article is libelous per se.

■■ As a general rule, a writing or printed article is libelous per se— that is, actionable without allegation or proof of special damages—" 'if it tends to expose a person to hatred, contempt or aversion, or to induce an evil or unsavory opinion of him in the minds of a substantial number of the community, even though it may impute no moral turpitude to him' . . . [or] tends to disparage a person in the way of his office, profession or trade."[2] So, too, a writing that charges the commission of a crime is libelous per se.[3]

The alleged offending article, which was published in the New York Times on June 24, 1974, reads as follows:

"A director closely associated with Michele Sindona, the Italian financier who is the biggest shareholder in the Franklin New York Corporation—the parent of the Franklin National Bank—is resigning from the board of the holding company.

"The man leaving the board is Carlo Bordoni, a Milan banker and director of Fasco International Holding, S. A., who played an important role in pushing Franklin into foreign-exchange trading in a major way. Fasco is a Luxembourg investment company owned by Mr. Sindona.

"It was in foreign-exchange trading that Franklin lost $45.8 million during the first five months of 1974, Franklin disclosed last Thursday in a long-awaited restatement of its earnings. The foreign-exchange loss was part of a $63.6 million over-all loss reported by Franklin for the five months.

*"Changes in Management*

"With Mr. Bordoni's resignation, Franklin's management in foreign-exchange trading has changed almost entirely.

"At the time Franklin's foreign-exchange losses were announced, Peter R. Shaddick, executive vice chairman and head of the bank's international operations, resigned. Andrew N. Garofalo, vice president and manager of the bank's foreign-exchange trading desk, resigned a short time later.

"Donald Emrich, a foreign-exchange trader with the rank of assistant casheir [sic], was dismissed

1. Jurisdiction is grounded upon diversity of citizenship and the parties agree New York law applies.

2. *Nichols v. Item Publishers, Inc.*, 309 N.Y. 596, 600–01, 132 N.E.2d 860 (1956), quoting *Mencher v. Chesley*, 297 N.Y. 94, 100, 75 N.E.2d 257 (1947). *Accord, Tracy v. Newsday, Inc.*, 5 N.Y.2d 134, 135–36, 182 N.Y.S. 2d 1, 3, 155 N.E.2d 853 (1959).

3. *Jordan v. Lewis*, 20 A.D.2d 773, 247 N.Y. S.2d 650 (1st Dep't 1964).

by the bank when the foreign-exchange losses were first disclosed.

"Then Franklin hired Edwin A. Reichers, a former senior vice president of the First National City Bank, as an executive vice president to reorganize its international currency trading operation.

"Whether the Bordoni resignation was merely a part of this foreign-exchange housecleaning or part of a downgrading of Mr. Sindona's influence at Franklin could not be determined. Mr. Sindona was not present at a Franklin board meeting last Thursday, but his absence was not unusual.

"Mr. Sindona has agreed to add as much as $50-million in new capital to the Franklin New York Corporation as part of a plan announced May 12. The plan was originally designed to increase the capital of the bank by that amount.

"In the Franklin's release last Thursday, however, Harold V. Gleason, then chief executive, stated that the money raised by stock sales would not be funneled into the bank but would be retained by the Franklin New York Corporation to meet the obligations of the parent company.

### "Barr Succeeded Gleason

"Mr. Gleason resigned last Thursday as chairman, president and chief executive officer, but he remained a director and also retained the title of executive vice chairman. Joseph W. Barr, former Secretary of the Treasury, took over immediately as chairman, president and chief executive. As chairman, of course, he is a member of the board of directors.

"Franklin New York Corporation has $35-million of 7.30 percent publicly held notes outstanding, and it also has a $30-million demand loan from the Manufacturers Hanover Trust Company. The publicly held notes mature in 1979, and the bank loan comes due in 1977.

"To raise $50-million, Franklin New York has disclosed plans to make two stock offerings—one prior to Feb. 21, 1975, and the other before Aug. 21, 1975. Mr. Sindona has agreed to purchase any shares not bought by other stockholders.

### "Sindona Has Loophole

"In its release Thursday, Franklin noted that Mr. Sindona's obligation to purchase unsubscribed shares in the two proposed stock offerings was subject to a continuation of the bank's normal business and also to an absence of lawsuits.

"This loophole, coupled with Mr. Bordoni's resignation, heightened the impression that Mr. Sindona might be withdrawing—either by plan or from pressure from the regulatory authorities—from Franklin.

"According to a published report in The Washington Post, efforts to merge the Franklin National Bank with either another New York bank or with a major English financial institution 'are far advanced.'

### "Source is Quoted

"The report, quoting 'an authoritative sources,' [sic], said the major matter that needed to be cleared up was whether the Federal Deposit Insurance Corporation would assume substantial risk for any potential losses that have not yet been uncovered.

"Mr. Gleason, however, on Thursday stated: 'Neither the bank nor the corporation [is] presently a participant in any negotiations involving a merger, sale of assets or other disposition of any interest in the bank.'

"Asked yesterday about the possibility of any merger plan's being 'far advanced,' Arthur G. Perfall, senior vice president of Franklin, replied: 'We stand by our statements of Thursday.'

*"Wille Denies F.D.I.C. Role*

"Frank Wille, chairman of the Federal Deposit Insurance Corporation, denied 'categorically' that the F.D.I.C. is participating or had participated in any discussion of a merger or sale of Franklin assets.

"Mr. Wille, who was at Sea Island, Ga., at a convention of Georgia bankers, said the F.D.I.C. was being kept informed also of what the Federal Reserve Board and the Controller of the Currency were doing.

" 'What we're all waiting to see,' Mr. Wille said, 'is the public reaction to the restated earnings and the management changes.' "

Essentially plaintiff charges that the above article is libelous per se in two respects: (1) that it defames him in his business reputation, professional competence and standing as an expert in international financial affairs, and (2) that it intimates he had participated in criminal acts in violation of federal banking and other laws.

As to the first charge, that the article libelled him in his business calling, the plaintiff contends this appears from its very language, without any innuendo. In this instance, he alleges three separate claims. The first, in addition to alleging that the article falsely impeached his professional competence and integrity, further charges that the defendant published it with knowledge of its falsity. The second claim substantially repeats the first, but alleges that the article was published in reckless disregard of the truth. The third claim [4] substantially repeats the first

two, but omits any charge of knowledge of falsity or recklessness.

■ With respect to these three claims, the complaint does not specify those statements in the article which plaintiff contends injure him in his business or profession, or impute to him some quality "which would be detrimental, or the absence of some quality which is essential to the successful carrying on of his offfice, profession or trade." [5] Since the libel complained of is with respect to plaintiff's business competence and integrity, it must appear that the article charged the plaintiff, in effect, with being "ignorant, incompetent, [or] incapable in his calling," [6] or otherwise impugned his professional standing and integrity.

■ In determining whether the article is defamatory, it must be read as a whole, and the words used given their natural import, and their plain and ordinary meaning. [7] So reading the article, with special emphasis on those portions which refer to plaintiff, the court concludes that the naked words of the article standing alone are not libelous per se. [8]

The article starts with the statement that Bordoni, a director closely associated with Sindona, the largest shareholder in Franklin, is resigning from the Board—a commonplace event in daily corporate life. The article continues that Bordoni "played an important role in pushing Franklin into foreign-exchange trading in a major way"; that it was in foreign-exchange trading that "Franklin lost $45.8 million during the first five months of

4. Listed as the fourth claim in the complaint.

5. *Cole Fischer Rogow, Inc. v. Carl Ally, Inc.,* 29 A.D.2d 423, 427, 288 N.Y.S.2d 556, 562 (1st Dep't 1968), *aff'd,* 25 N.Y.2d 943, 305 N.Y.S.2d 154, 252 N.E.2d 633 (1969).

6. *Amelkin v. Commercial Trad. Co.,* 23 A.D. 2d 830, 259 N.Y.S.2d 396, 398 (1st Dep't 1965), *aff'd,* 17 N.Y.2d 500, 267 N.Y.S.2d 218, 214 N.E.2d 379 (1966).

7. *November v. Time, Inc.,* 13 N.Y.2d 175, 178–79, 244 N.Y.S.2d 309, 194 N.E.2d 126

(1963); *O'Connell v. The Press Pub. Co.,* 214 N.Y. 352, 358, 108 N.E. 556 (1915); *Morrison v. Smith,* 177 N.Y. 366, 368, 69 N.E. 725 (1904); *Scheinblum v. Long Island Daily Press Pub. Co.,* 37 Misc.2d 1015, 239 N.Y.S.2d 435, 438 (Sup.Ct.1962), *aff'd,* 18 A.D.2d 841, 239 N.Y.S.2d 533 (2d Dep't 1963).

8. *See Tracy v. Newsday, Inc.,* 5 N.Y.2d at 137, 182 N.Y.S.2d 1, 155 N.E.2d 853; *Reoux v. Glens Falls Post Co.,* 11 A.D.2d 919, 203 N.Y.S.2d 497, 498 (3d Dep't 1960).

1974," which loss was part of a larger loss reported by Franklin for that period; that with Bordoni's resignation "Franklin's management in foreign-exchange trading has changed almost entirely." Then follows a statement that two officials who had been respectively head of the Bank's international operations and manager of its foreign-exchange trading desk, had resigned at about the time the foreign-exchange losses were announced. The following paragraphs refer to the dismissal of one of the Bank's foreign-exchange traders when the losses were first disclosed, and to the hiring of a new executive vice president "to reorganize its international currency trading operation," and the article continues that "[w]hether the Bordoni resignation was merely a part of this foreign-exchange housecleaning or part of a downgrading of Mr. Sindona's influence at Franklin could not be determined."

Plaintiff places heavy store upon the foregoing as reflecting upon his ability and expertise in foreign exchange monetary matters. He emphasizes the statement that it was plaintiff "who played an important role in pushing Franklin into foreign-exchange trading in a major way." But this is to fragmentize and dissect the article rather than to read it as a whole and in context. Indeed, for a director of a corporation to urge, even in a strong way by force of his individual influence, a policy upon fellow directors does not reflect upon one's professional standing or competence. It is the legitimate exercise of a director's function, whether he is an inside or an outside director, as plaintiff describes himself. Foreign-exchange trading is lawful and may result, as in the instance of any other type of investment, in either profits or losses. The article itself suggests the Bank's continuation in foreign-exchange trading by the reference to the hiring of an executive vice president to reorganize the Bank's international currency trading operation.

■■ Plaintiff's claim that the article attributes to him the Bank's substantial losses in foreign-exchange trading is not borne out by a fair reading of the article in context.[9] While it is true that the bank's policy of engaging in foreign-exchange trading in a major way may be attributed to plaintiff, the article does not state or imply that he managed the Bank's foreign-exchange trading or played any role in the actual transactions which resulted in the losses. To the contrary, the references to the resignation of top officials of the Bank in charge of its foreign-exchange program and the dismissal of a foreign-exchange trader suggest it was they, if anyone, who were responsible for the losses.[10]

■ Finally, giving full sway to plaintiff's allegations in his complaint as to his background, prestige and standing, even if the article were read to defame plaintiff, the complaint must be dismissed under New York law. Through the years New York has adhered to the "single-instance" rule first enunciated by its courts in 1811 in *Foot v. Brown*.[11] There it was held that charging an attorney with ignorance or unskillfulness in his handling of a particular case was not actionable in the

---

9. As already observed, no innuendo is pleaded as to the claims alleging libel of plaintiff in his calling. Any such innuendo should have been pleaded. See *Kimmerle v. New York Evening Journal, Inc.*, 262 N.Y. 99, 101, 186 N.E. 217 (1933); *Morrison v. Smith*, 177 N.Y. 366, 369, 69 N.E. 725 (1904); *Cole Fischer Rogow, Inc. v. Carl Ally, Inc.*, 288 N.Y.S.2d at 562; *Reoux v. Glens Falls Post Co.*, 203 N.Y.S.2d at 498; *Lasky v. Kempton*, 285 App.Div. 1121, 140

N.Y.S.2d 526 (1st Dep't 1955); *Yonkers R. R. v. Herald Statesman, Inc.*, 248 App. Div. 633, 288 N.Y.S. 286 (2d Dep't 1936), aff'd, 273 N.Y. 541, 7 N.E.2d 683 (1937); *Kuster v. Press Pub. Co.*, 80 App.Div. 615, 80 N.Y.S. 1050, 1051 (1st Dep't 1903).

10. For the applicable standard in determining whether an innuendo is warranted, see note 16, 1230 *infra* and accompanying text.

11. 8 Johns. 64.

absence of a plea of special damage [12] The continuing vitality of the "single-instance" rule was reaffirmed by the New York Court of Appeals in *November v. Time, Inc.,*[13] where the court noted:

> "[T]he rule still holds that language charging a professional man with ignorance or mistake on a single occasion only and not accusing him of general ignorance or lack of skill cannot be considered defamatory on its face and so is not actionable unless special damages are pleaded."[14]

The single-instance rule was applied recently in a case that parallels the instant one. There plaintiff, the publisher of an investment advisory service, charged that the defendants circulated in the financial community and among members of the investing public a monthly magazine which contained an article stating that plaintiff had recommended a stock which had declined in value—that "the stock is running backward." The Appellate Division reversed an order of Special Term denying dismissal of the complaint and granted summary judgment to defendants.[15] The court noted that the article consisted "of the sardonic recital of what at worst might be considered a single instance of mistaken exercise of business judgment on plaintiff's part, without any imputation of fraud, deceit or malpractice," and held that the complaint did not state a cause of action in libel by any applicable standard.

Plaintiff contends that the "single-instance" rule is inapplicable upon a claim that the article charges him with more than one error with respect to the Bank's foreign-exchange trading—that it charges "plaintiff's policies and practices over a course of years involving a myriad of foreign currency transac-

tions conducted on behalf of the Bank resulted in Franklin' National Bank's suffering losses of $45.8-million which in turn brought the Bank to the brink of financial disaster." However, this contention is without substance since it disregards the plain language of the article. As already noted, the article does not state or imply that Bordoni played any role in the actual foreign currency transactions which resulted in the losses. What it does state is that he played an important role in pushing Franklin into foreign-exchange trading. This was single advice or advocacy of a single policy of investment to management. The article does not directly or indirectly state that Bordoni thereafter engaged in or directed any of the transactions which effectuated the foreign-exchange trading policy.

The court concludes that the article does not defame the plaintiff in his calling, and even if it did call into question his business judgment in advocating the foreign-exchange policy, the "single-instance" rule would bar recovery. Accordingly the three claims here considered are dismissed.

There remains for consideration the claim wherein plaintiff relies upon an innuendo to support the charge that the article is libelous per se in charging that he participated in criminal acts. Under this claim it is first alleged that it is well known in the financial community that Franklin is a publicly owned company whose stock is traded on the New York Stock Exchange and is required to file periodic reports with the Exchange and various federal regulatory agencies. Then it is further alleged that by the article the defendants meant and were understood by persons reading it to mean that Bordoni had participated in criminal acts in violation of

12. *See also Twiggar v. Ossining Print. & Pub. Co.,* 161 App.Div. 718, 146 N.Y.S. 529 (2d Dep't 1914), *appeal dismissed,* 220 N.Y. 716, 116 N.E. 1080 (1917) (charging dentist with unskillful work on a patient held not to state a claim in the absence of an allegation of special damage).

13. 13 N.Y.2d 175, 244 N.Y.S.2d 309 (1963).

14. *Id.* at 178, 244 N.Y.S.2d at 311.

15. *Arnold Bernhard & Co. v. Finance Pub. Corp.,* 32 App.Div.2d 516, 298 N.Y.S.2d 740 (1st Dep't), *aff'd,* 25 N.Y.2d 712, 307 N.Y.S. 2d 220 (1969).

federal banking laws and regulations, including but not limited to disclosure requirements to which public and banking corporations such as Franklin and the Bank are subject.

Plaintiff perforce resorts to innuendo to support this claim, since the article makes no reference to criminal acts by him or for that matter by any other person named in the article. To sustain the innuendo, plaintiff underscores the following portion of the article:

> "Sindona Has Loophole
>
> "In its release Thursday, Franklin noted that Mr. Sindona's obligation to purchase unsubscribed shares in the two proposed stock offerings was subject to a continuation of the bank's normal business and also to an absence of lawsuits.
>
> "This loophole, coupled with Mr. Bordoni's resignation, heightened the impression that Mr. Sindona might be withdrawing—either by plan or from pressure from the regulatory authorities—from Franklin."

Based primarily thereon, plaintiff contends that the article suggested that the "regulatory authorities" were investigating the activities centering about the foreign-exchange losses, which, so to Bordoni, and that the authorities to Bordoni, and that the authorities were exerting pressure on the Bank to sever its ties with both Bordoni and Sindona. The argument continues that "[b]y innuendo, therefore, the article stated that Bordoni may have been involved in some kind of fraudulent criminal activity in connection with such losses." This is stretching an innuendo beyond its outer limits.

 It is for the court to decide whether the article is capable of the meaning ascribed to it, and if it is not, then innuendo cannot make it libelous.[16] It does violence to the ordinary and natural meaning of the language quoted

above, read in conjunction with the remainder of the article, to say it is reasonably susceptible to plaintiff's interpretation. The innuendo that plaintiff participated in or committed criminal acts is unwarranted—it is "strained, unreasonable and unjustified."[17] Accordingly, the claim based upon innuendo is also dismissed.

---

16. *Tracy v. Newsday, Inc.*, 5 N.Y.2d at 136, 182 N.Y.S.2d 1, 155 N.E.2d 853.

17. *Id.* at 137, 182 N.Y.S.2d 1, 155 N.E.2d 853.