**Shaul LADANY, Plaintiff,**

v.

**WILLIAM MORROW & COMPANY, INC. and Serge Groussard, Defendants.**

**No. 75 Civ. 5473–CSH.**

United States District Court, S. D. New York.

Dec. 27, 1978.

---

1. His attention is directed particularly to Sections 1420–1422 of Chapter 15A.

Corwin & Frey, New York City, for plaintiff; Erwin L. Corwin, Susan G. Rosenthal, New York City, of counsel.

Schwab, Goldberg, Price & Dannay, New York City, for defendant William Morrow & Company, Inc.; Richard Dannay, Morton David Goldberg, New York City, of counsel.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

Plaintiff Shaul Ladany was a member of the Israeli Olympic team which participated in the September, 1972 Olympic games at Munich, Germany. The team was victimized by the murderous "Black September" terrorist attack. Defendant Serge Groussard, a French journalist, wrote a book about the attack.[1] It was published in France under the title "La Medaille de Sang." Defendant William Morrow & Company, Inc. ("Morrow") published an English translation titled "The Blood of Israel." The book contains a number of references to Ladany. He claims they are defamatory and constitute an invasion of his privacy. Damages and injunctive relief are sought from Morrow under the law of libel and the New York Civil Rights Law, §§ 50 and 51. Following extensive discovery, Morrow moves for summary judgment dismissing the complaint. Ladany cross-moves for summary judgment on the issue of liability.

### I.

As to plaintiff's claim for libel, the threshold question is whether the words complained of "are reasonably susceptible of a defamatory connotation"; that question is for the Court, not the jury.[2] *James v. Gannet Co., Inc.,* 40 N.Y.2d 415, 418, 386 N.Y.S.2d 871, 874, 353 N.E.2d 834, 837 (1976).[3] A publication's "susceptibility to a

1. The action against Groussard was dismissed for want of personal jurisdiction.

2. In point of fact, no jury has been demanded in this case.

3. Implicit in citations of authorities in the parties' briefs is their agreement that New York law is to be applied. Jurisdiction is based on diversity of citizenship.

reading of libelous meaning, is a matter of law, not fact." *El Meson Espanol v. NYM Corp.*, 521 F.2d 737, 739 (2d Cir. 1975), citing New York cases.

Before considering the passages with which plaintiff finds fault, we must set the stage.[4] The teams participating in the 1972 Olympiad were housed in a specially constructed "Olympic Village" consisting of blocks of apartments. The Israeli team was quartered in 31 Connollystrasse, or "Block 31." Block 31 contained six apartments, numbered 1 through 6, with separate entrances. Ladany was one of six occupants of Apartment 2. He was a long-distance walker. The other occupants of Apartment 2 were Avraham Melamed, a swimmer; Dan Alon and Yehuda Weinstein, fencers; and Henry Hershkowitz and Zelig Shtroh, riflemen.

The Black September terrorists began their attack on Block 31 in the early morning hours of September 5, 1972. They broke down the door to Apartment 1 and took six of its seven occupants hostage. The seventh occupant of No. 2, wrestling coach Moshe Weinberg, was surprised on the street walking home, wounded, and brought by the terrorists to Apartment 3, which they entered, taking six more hostages. The terrorists did not enter Apartment 2 because Weinberg apparently persuaded them that no Israelis were there.

Ladany and his five companions in Apartment 2 escaped. Ladany complains in this action of the book's account of his escape. The passages of the book which Ladany claims are false and defamatory are set forth in his brief (pp. 7–11), and quoted below in their entirety:[5]

"Pages 44–46: So, Moshe Weinberg had saved the lives of the occupants of Apt. 2. Temporarily, or not? The terrorists had taken No. 1 and No. 3. The uneasy peace that, as 5:00 AM approached, still bathed No. 2, caught between the two captures, was strange—and fraught with anxiety.

With each passing instant, the danger increased.

"For one of the five Israelis in No. 2, the wait at the gates of hell was over. He was Shaul Paul Ladani, doctor of laws, professor of economics at Tel Aviv, thirty-six, walker, champion of Israel.

"I met him at least ten times during that day of September 5.

"On September 3, he had taken part in the 50-kilometer walk and come in 19th out of 36; he had been shown in closeups on TV—not because of placing 19th (although there is nothing shameful in that), nor because of his style or looks. He is a short man, whose slightly bowed legs are inordinately stocky and ill-proportioned. His thick myopic glasses kept sliding down his nose. Half bald, he had shaved off the remainder of his hair. As his arms worked frenetically, his shoulders heaved, and his hips swiveled in the intensity of the heel-and-toe event, he looked as though he were in torture—which was absolutely not true.

"No, Shaul Ladani was on TV because he had been born in Germany, at seven had been arrested with his parents and sent to the extermination camp of Bergen-Belsen. In 1945, a miracle happened: he was included in a batch of children and old people an American organization was able to ransom from the Third Reich for a fortune in cash. His whole family had perished. He himself had typhus. Born April 2, 1936, he was going on the age of nine.

"He had escaped from Apt. 2 at about 4:30 AM, just after the terrorists broke into No. 1, while Gutfreund shouted the alarm.

" 'Everything took place so fast, that I acted instinctively, without a chance to think,' he told me in a muffled even voice that was beyond pathos.

"I could see his dark eyes, behind the imitation-shell glasses. They dwelt on

---

4. The following account is drawn from the motion papers and exhibits, including a copy of *The Blood of Israel.* The facts about to be recited are undisputed.

5. The book misspells plaintiff's name as "Ladani" throughout.

mine, but did not see me. He is solidly built, his thighs seem to be of steel; on the top of his head, the sparse hair was growing back, graying.

" 'I was sleeping upstairs, on the garden side, alone,' he said. 'It had just worked out that way. Strange voices jolted me awake. I had the feeling someone had called me, from downstairs. I went down the stairs. The calls came again, from outside, somewhere close by. The whole place was totally, strangely silent. I did not really know what it was, but it gave me the shivers. I went into the kitchen, because it seemed to me the shouts had come from the building lobby, which is alongside half our ground floor, from the kitchen to the wall on Connollystrasse.

" 'Then I heard Gutfreund's voice, dimmed, but so recognizable, "Sakanah! Harbiya!" I understood, I thought—well, I don't know what. I had the absurd feeling that everyone had run away, and I was left alone, and the Arabs were coming. I ran up to my room. I must have waited there a few seconds. I didn't dare move.

" 'And then the shots rang out. Ever since Bergen-Belsen, I recognize them right off. It was Sokolovsky running out through the back of the Block on what we call the "garden path." I was sure it was from the main floor of our own apartment that the shots were raining. I opened the French window, and went out on the balcony. I looked at the distance to the ground—five or six meters. I jumped. I skinned my knees pretty badly but didn't feel it at all. I got up and ran, and ran. Finally, I went into a building. Italians . . . Time to explain to them, and to call the police. The Germans had just heard about the attack. . . .'

"He stopped, and cracked his knuckles. He answered my question forthrightly: 'Did I think of the others? Sure. I felt terribly sorry to leave Gutfreund and the other guys, but it wouldn't have done them any good at all, for me to be just another hostage.'

"Doing what he did, Ladani brushed up against death. He appeared in the fedayeen's view just as they finished shooting at Sokolovsky, now out of their sight. They were too surprised to fire at this man who appeared from nowhere, in white undershirt and shorts, running barefoot with his glasses slipping down his nose. He got to the main part of Connollystrasse, by going around the Bolivians' building. After that, he went forward in leaps and bounds, hiding in between walls or hydrants. He reached the Italians' quarters (the tower called 8–12 Connollystrasse) at only about 4:45 AM.

"Page 48: One of the other men in the apartment, the fencer Dan Alon, ran into the bedroom, shouting abruptly, 'Has Shaul Ladani lost his marbles or what? He just suddenly disappeared, you should see how. Yehuda [Weinstain, also a fencer] and I heard some noise outside the window. I went to look, and Shaul was getting up. Had fallen, or jumped, from the second-story balcony. I yelled, "Shaul!" but he didn't even make a sign. He looked like one possessed. He probably didn't hear me: his knees were bleeding. He started to run as hard as he could toward the Girls' Village. In his underbriefs, can you imagine? Yehuda didn't want to wake you, but I thought—'

"Page 49: Lalkin shook his head. Sure, something was going on. But where? Hershkowitz added, 'Ladani beat it. Without a word. All alone. He went that way—'

"And he pointed east, toward the wide part of Connollystrasse, the tall lacework of the towers. Lalkin nodded understanding.

"Page 53: In Apt. 2, Hershkowitz was the senior man, the guide. He felt very sure of himself, and knew Lalkin was right; yet his instinct told him to stay put. He explained to the others: 'Ladani, running away by jumping like a goat, made the Arabs realize they were far from capturing the whole team. Anyway, they must have been at the Opening Ceremony, and they can count. They

know that to get in here, they have to break the door down. They can see that won't be easy, because we could barricade it with furniture. By the presence of the security men they now know the police have been alerted. They must be afraid that if they try to storm our lodging Germans will shoot at them from the rear. So they're waiting for us to walk into the trap. They want us to do like Ladani, so they can shoot us down like rabbits.'

"The others were thinking. Zelig Shtroch put it: 'Maybe one of our guys they took told them Number Two has Uraguayans or the guys from Hong Kong in it. They never did get Ladani, so they may be thinking he was just a South American who got scared.'

"Page 54: 'Listen. Let's admit you make it. OK. Maybe a second guy will, too. But there are four of us. They'd have to be blind to miss the third one.'

" 'I'm willing to go last.'

" 'That's not the point. You or another. We're all Israel.'

" 'Then let me go alone.'

"Weinstain had hardly uttered those words when he thought better of his idea—for fear this second escape by someone from No. 2 might seal the doom of the three left behind. . . ."

It is common ground that this account contains elements of falsity. Most significantly, Ladany did not escape from the apartment alone, leaving the other five occupants there. His affidavit and those of Weinstein, Hershkowitz, Shtroh, Melamed and Alon [6] recite—and Morrow does not

contest—that after the six occupants of Apartment 2 became aware of the attack, they discussed the situation and then left substantially together, within a span of two or three minutes, exiting through the sliding door in the ground floor bedroom Ladany and Melamed shared, and thence to a terrace and lawn at the rear of the building. Ladany then went to Apartment 5, occupied by Shmuel Lalkin, head of the Israeli delegation. Lalkin already knew of the attack. Weinstein joined Ladany in Lalkin's room. They eventually left the building together.

The affidavits are not in complete agreement as to the precise order in which the six occupants of Apartment 2 left it. The discrepancies are not significant. What is clear is that, in essence, Ladany and the other five left together. The account in Groussard's book, which pictures Ladany escaping alone, to the surprise of his companions (who saw him go and did not know why), is false.

It also appears to be conceded that the interviews with Ladany which Groussard describes in his book, upon which the account is largely based, never took place. Ladany denies in his affidavit ever meeting or speaking with Groussard prior to commencement of the litigation.[7] The tape of a conversation Groussard consented to have with Ladany on December 22, 1975 makes it clear that Groussard relied for his account upon what Lalkin and others told him. Groussard, reconstructing what happened to Ladany, quite clearly drew incorrect inferences from what he was told by others.[8]

6. Ex. D–H to the Ladany affidavit.

7. Ladany affidavit, p. 10.

8. The tape of the Ladany/Groussard conversation is Ex. I to the Ladany affidavit. At p. 12, Groussard says:
   "But I have to say that Shmuel was the first to tell me. Excuse me, I will go back to the facts. He said, 'Well, you are wrong and Ladani is right.' Excuse me, no. But in these interviews with me, with Oriana Falacci who is a friend of mine, with everybody here, he gave at least a dozen, he just forgot to, he did not mention you. Then, I was sure

that you escaped before. Why did you escape before? First you heard Gutfreund's shout, 'Get away! Get away! [sic] That many others head but not you. 'Get away! Israeli, get away!' Second, it was an order. Sokolovsky obeyed this order. He ran away. Second thing, you heard shots. Then you understood that there was a terrible danger, and Gutfreund was right to give you orders to go out. Thirdly, you were alone in your room, and I was wrong, he was not alone. You were not alone. I did not know that."
At pp. 13–14, he continues:
   "Then, after that you had, in my reconstitution . . . I was told that by them. Why

Words are not actionable solely because false; they must also defame. *Tracy v. Newsday, Inc.*, 5 N.Y.2d 134, 138, 182 N.Y.S.2d 1, 5, 155 N.E.2d 853, 857 (1959); *Nichols v. Item Publishers*, 309 N.Y. 596, 601–2, 132 N.E.2d 860, 862 (1956). Ladany contends that the quoted words are libelous per se. The complaint does not allege innuendo [9] or special damages. Therefore the only question is "whether the naked words complained of are defamatory as a matter of law." *Reoux v. Glens Falls Post Company*, 11 A.D.2d 919, 203 N.Y.S.2d 497, 498 (3rd Dept. 1960).

In *Bordoni*, n. 9, *supra*, Judge Weinfeld adopted this general statement from New York cases:

> "As a general rule, a writing or printed article is libelous per se—that is, actionable without allegations or proof of special damages—' "if it tends to expose a person to hatred, contempt or aversion, or to induce an evil or unsavory opinion of him in the minds of a substantial number of the community, even though it may impute no moral turpitude to him" . . [or] tends to disparage a person in the way of his office, profession or trade.' " 400 F.Supp. at 1225.

These essential elements of libel per se are familiar. "The only difficulty is the application of the well-established rules to particular words." *Reoux, supra*, 203 N.Y.S.2d at 498.

The first two claims for relief pleaded in the complaint allege the falsity of the book's account and its defamatory nature. The principal allegation is that the book depicts Ladany as a coward. Thus ¶ 16 of the complaint claims that the quoted statements:

> " . . . depict and portray plaintiff as a coward who, although aware of the attack on his teammates, deserted them and ran without taking the time to warn his fellow teammates, leaving Gutfreund to die and by such action endangered the lives of the remaining athletes."

It is further alleged that Ladany is held out:

> " . . . as a coward who thought only of himself and ran in the face of the enemy, deserting his comrades." ¶ 20.

And further, that the book's

> " . . . plain meaning is that plaintiff's cowardly action further endangered the lives of his comrades by alerting the attackers and allowing them to prepare a trap for the other Israeli team members." ¶ 21.

While the complaint also alleges that Ladany was defamed by being portrayed as "physically deformed" (¶ 17), "a pathetic and weak individual" (¶ 18), and a "pitiable individual not capable of attracting attention for his athletic ability" (¶ 19), plaintiff's brief in the present motion is limited to the question of cowardice. The other

---

I did the reconstitution of Hershkowitz. Hershkowitz said to me yesterday, I recognize many things. I (inaudible) told, at the window, but we never spoke of Ladani for one reason. It is the only point you are wrong because just Ladani, what we said, was with us. That is the point in this story. Then my reconstitution was like it is. The only thing I never will do that again. I imagined that like a piece of theatre. I come back again to the facts. I said, first thing, Weinstein, because I was told and Hershkowitz acknowledged that, that one of you, Weinstein, the young one, wanted to escape immediately. Then, first thing, Hershkowitz did not understand why (inaudible) were escaping. Second thing, he understands after that you went right to the police to help. It is the end of the story as far as he was concerned. In my poor brains, but I was wrong because I did you harm. Hershkowitz said to me,

everything you write about this conversation is good, except Ladani's story."

9. Innuendo is averred by a libel plaintiff "suing on words not libelous on their face, to show the defamatory meaning and application of the language used," 1 Harper & James, *The Law of Torts* (1956), at § 5.9, p. 373. "The admitted purpose of an innuendo is to explain matter that is insufficiently expressed. Its office is to point out the libelous meaning of the words used." *Tracy, supra*, at 5 N.Y.2d 136, 182 N.Y.S.2d 3, 155 N.E.2d 854. Under New York law an innuendo must be affirmatively pleaded by plaintiff. *Bordoni v. New York Times Company, Inc.*, 400 F.Supp. 1223, 1228 n. 9 and cases cited. The present plaintiff chooses not to do so, remarking in his brief (p. 26): "No innuendo is alleged by plaintiff; the libel is manifest on the face of the publication."

defamations perceived by the complaint, to the extent they do not relate to the central concept of cowardice, may be deemed abandoned.[10] The essence of plaintiff's claim is he was depicted as a coward, and that is libelous per se. Plaintiff relies upon Prosser, *The Law of Torts* (4th ed. 1971) at § 111, pp. 740–741:

> " . . . it is defamatory upon its face to say that the plaintiff . . . is a coward, . . . because all of these things obviously tend to affect the esteem in which he is held by his neighbors."

No quarrel may be had with that proposition, or with the two cases Prosser cites in its support: *Price v. Whitely*, 50 Mo. 439 (1872) (description of plaintiff as "that imp of the devil and cowardly snail, that shrinks back into his shell at the sight of the slightest shadow" is libelous per se); and *Byrne v. Funk*, 38 Wash. 506, 80 P. 772 (1905) (characterization of plaintiff as a "liar and poltroon" libelous per se). But Morrow points out, correctly, that Groussard's book nowhere refers to Ladany as a "coward," or accuses him of "cowardice" or "cowardly" behavior, *in haec verba*. Ladany responds that such is the necessary implication arising out of the words used.

In determining whether the book is defamatory, its pertinent chapters must be read as a whole. *James, supra*, at 40 N.Y.2d 419, 386 N.Y.S.2d 874, 353 N.E.2d 837; *Bordoni, supra*, at 1227. In the case at bar, that requires careful consideration of pages 1–75, which deal with the initial attack and escapes. The balance of the book deals with subsequent events. The Court "will not pick out and isolate particular phrases"; nor will it "strain to place a particular interpretation on the published words." *James, ibid.* Rather, the words are "given their natural import, and their plain and ordinary meaning." *Bordoni*, at 1227, and cases cited at n. 7. The Court's construction "is to be derived as well from the expressions used as from the whole scope and apparent object of the writer." *James, supra*, quoting *Cooper v. Greeley*, 1 Denio 347, 358.

■ Measured by these standards, the words in question are not libelous per se. The words are undoubtedly false, and Ladany takes understandable offense at them; the Court does not doubt the sincerity of his outrage. But the test is objective, not subjective. Under the traditional standards, the words are not defamatory. It may be said of this case, as in *Tracy, supra*, at 5 N.Y.2d 138, 182 N.Y.S.2d 5, 155 N.E.2d 855: "Though the report may be false and probably offensive, it is not actionable."

Ladany contends that "the effect of the words employed in the book is to brand plaintiff's actions at the Munich Olympics às cowardly." (brief, p. 21). Groussard does not call him a coward. Thus the question is whether an ordinary reader of the entire account would infer Ladany's cowardice from the words Groussard used to describe his actions.

Essentially, two assertions are said to form the basis for an inference of cowardice: that Ladany fled from the apartment; and that he failed to warn his comrades. Neither assertion, when considered in the context of the entire account, supports the inference.

As to flight, the whole thrust of Groussard's account is that in the circumstances escape was the only prudent course. Thus the wrestling coach Gutfreund, who briefly held the door of Apartment No. 1 against the attackers, and emerges from the book as an heroic figure, cried out:

> "Harbiya! Terroristen! Haverim, lehu maher!"

which is translated as:

> "Arabs! Terrorists! *Comrades, get out fast!*" Book at p. 13 (emphasis added).

This is the warning which, according to the book, Ladany heard and acted upon. So did Tuvia Sokolovsky, the weightlifting coach, who also resided in No. 1. He heard Gutfreund's cry, saw Gutfreund straining to hold the door shut. As the door began to open Sokolovsky ran into his bedroom,

---

**10.** In any event they are not even arguably libelous.

smashed the window, and fled for his life. (Book, pp. 13–15). Gad Tsobari, taken hostage in No. 3, bolted, ran and escaped while that group of hostages was being transferred by the terrorists along the street (pp. 34–36). Groussard's account reflects that other Israelis would have fled instantly if they had the chance; it is said of two other team members, who did not escape: "The interval might have been time enough for the two Jewish athletes to open the window and jump off the balcony" (p. 29). Thus Ladany is not the only Israeli depicted as running away; nor is Groussard's account in any way critical of those who did. On the contrary, his book *defends* such action against the criticism of others. Groussard writes of Tsobari:

"*Hard as it is to imagine*, Tsobari was later attacked in the Israeli press. 'A few journalists,' as he put it, wrote that he should have stayed with his comrades, and that he had shown a nasty streak of selfishness by leaving them. They claimed that in doing this he made the terrorists more vigilant . . . *Poor Tsobari!*" p. 36 (emphasis added).

The perceived implication that Ladany deserted his comrades without warning them would present a closer question if the perception was justified by the text. In fact, it is not. The unmistakable impression given by the book is that *Ladany believed himself alone in the apartment.* Thus Ladany is quoted as saying he "was sleeping upstairs, on the garden side, alone" when he heard strange voices. He went downstairs. "The whole place was totally, strangely silent." He went into the kitchen. Then he heard Gutfreund's cry: "Sakanah! Harbiyah!" ("Danger! Arabs!") He "had the absurd feeling that everyone had run away, and I was left alone, and the Arabs were coming." He ran to his room, heard shots, escaped through a window, and thence to another building to call the police.

Ladany's impression, conveyed by the book, that he was alone in Apartment No. 2

is not altered by a quotation, stressed by plaintiff, from the fictitious interview with Groussard. In the book, Ladany is made to say to Groussard:

" 'Did I think of the others? Sure. I felt terribly sorry to leave Gutfreund and the other guys, but it wouldn't have done them any good at all, for me to be just another hostage.' "

Reading this statement in context, it is clear that the reference to "Gutfreund and the other guys" embraces those Israelis resident with Gutfreund in Apartment No. 1. The book is not in the least critical of team members who did not attempt to go to the assistance of colleagues in the besieged apartment.[11] As to the other residents of his own apartment, Ladany is depicted as believing they had all left him.

An inference of cowardly desertion of one's comrades may arise only if the actor is depicted as knowing of their presence and deliberately abandoning them. Conrad's Lord Jim knew he was abandoning persons in peril when he went over the side. If Ladany was portrayed in the book as having been awakened by shouts or shots, and, *with an awareness of the presence of his comrades in the apartment*, deciding to flee without warning them, the question of defamation would turn upon a balancing of the exigencies of the moment—"sauve qui peut!"—with a duty to warn which ordinary readers might well perceive. In point of fact the need for such balancing does not arise, since Ladany is portrayed as believing he had been left alone.

Groussard's account is in no way critical of Ladany's action; nor does he suggest any feeling of guilt or remorse on Ladany's part. Ladany is described as answering the question quoted *supra* "forthrightly." My own discussion becomes somewhat surreal at this point, since Groussard made the whole interview up out of whole cloth. However, falsity is not the issue. The point is that "the whole scope and apparent object of the writer" are significant in the

11. Indeed, Groussard is sympathetic to, not critical of, Sokolovsky, who resided in No. 1 with Gutfreund; heard the latter's cry; saw

him trying to hold back the attackers; and promptly escaped through a window.

Court's construction, *Cooper v. Greeley, supra*; and it is material to observe that Groussard does not criticize Ladany in any respect.

Plaintiff also stresses, quite understandably, the equally false comments ascribed to other residents of Apartment No. 2 when they purportedly observed Ladany's flight. Alon is meant to have asked the others if Ladany "had lost his marbles"; he describes Ladany jumping or falling from the second-story balcony and running away. Alon is made to say that he "yelled 'Shaul!' but he didn't make a sign." Hershkowitz is made to say: "Ladany beat it. Without a word. All alone." At the time of these wholly fictitious remarks, the other residents of the apartment are portrayed as being unaware of the terrorists' attack. Later, with such awareness, Hershkowitz is made to "explain" to the others that:

"Ladany, running away by jumping like a goat, made the Arabs realize they were far from capturing the whole team . . . So they're waiting for us to walk into the trap. They want us to do like Ladany, so they can shoot us down like rabbits."

Shtroh is made to say that the Arabs "never did get Ladany, so they may be thinking he was just a South American who got scared."

These are the only passages which are arguably defamatory. They could be read as depicting the perception of Ladany's comrades in the apartment that he had left them without saying why. The question is whether that furnishes a sufficient basis for an inference of cowardice. It does not when the account is read as a whole. Cowardice, like bravery, is individual. The actor's mental processes are of greater significance than the perceptions by others of his acts. As noted, the book's account is based upon the premise that Ladany thought he was alone in the apartment when he fled from it. That being so, there is no basis from which the reader could draw an inference of Ladany's actual cowardice, even if the quoted comments of the others could be read as suggesting its appearance. Nor is even that suggestion entirely clear; none of the comments ascribed to the others contain direct accusations of dishonorable conduct on Ladany's part. The *James* court, holding that two quotations ascribed to plaintiff, a belly dancer, in a newspaper article [12] were not defamatory, reminds us that "the court will not pick out and isolate particular phrases but will consider the publication as a whole." 40 N.Y.2d at 419, 386 N.Y.S.2d at 874, 353 N.E.2d at 838. Defamation is not established by "straining to reach a result quite inconsistent with a fair reading of the text." *Drug Research Corp. v. Curtis Publishing Co.*, 7 N.Y.2d 435, 440, 199 N.Y. S.2d 33, 36, 166 N.E.2d 319, 321 (1960). To brand the book's references to Ladany as defamatory, within the context of the entire account of the assault and escapes, I would have to transgress these rules.

The case, in short, is comparable to *Tracy, supra:* the book's references to Ladany are undoubtedly false [13] and most probably offensive; [14] but tested by established rules

---

12. "Specifically, she objects to the statement that 'she admits to selling her time to lonely old men with money, for as much as $400 an evening in one case, "just to sit with him and be nice to him".' In a later paragraph, the plaintiff is quoted as saying: ' "Most men can talk to me. They can't talk to their wives because they're blocked by society. Do you understand what I'm saying? They're looking for something they've lost at home. This is my business. Men is my business." ' Of this paragraph, the plaintiff objects only to the phrase, 'Men is my business.' " 40 N.Y.2d at 418, 386 N.Y.S.2d at 873–4, 353 N.E.2d at 837.

13. The fabrications are totally irresponsible, particularly since Groussard, a self-styled jour-

nalist, emphasizes the thoroughness of his research and the accuracy of the narrative.

14. Ladany stresses his service as an officer in the Israeli army, and citations he has received for efforts in rejoining his unit from overseas after war broke out. While these circumstances no doubt fueled his indignation concerning Groussard's account, the situations are hardly analogous. Officers may be expected to use their best efforts to rejoin armed units in contact with the enemy. The Israeli athletes at Munich were unarmed and surprised in the dark of night by heavily armed attackers. As noted *supra*, Groussard argues convincingly in his book that in these circumstances flight was prudent. For comparable reasons, plaintiff's

they are not libelous per se, and hence are not actionable.[15] The first two causes of action will be dismissed. This disposition makes it unnecessary for the Court to consider the interesting, and well briefed, questions of whether Ladany was a public figure, and if so, Morrow's liability under *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) and its progeny.

## II.

Plaintiff's third and fourth causes of action claim injunctive relief and damages pursuant to §§ 50 and 51 of the New York Civil Rights Law, 8 McKinney's Consol. Laws of N.Y. (1976), the pertinent provisions of which are set forth in the margin.[16]

Plaintiff contends that, by publishing the Groussard book, Morrow used his name "for the purpose of trade," without having first obtained his written consent, in violation of the statute. Morrow raises the threshold question of the statute's applicability to the facts of the case. Resolution of that question requires consideration of the genesis of the Civil Rights Law, its purpose, and construction by the courts.

In *Roberson v. Rochester Folding Box Co.,* 171 N.Y. 538, 64 N.E. 442 (1902), the Court of Appeals of New York held that an individual's "right to privacy" did not exist in law and was unenforceable in equity, with the result that a young woman whose picture was used, without her consent, to

---

general references to Israel's customs and values (brief, p. 22) are beside the mark.

**15.** Plaintiff's motion papers endeavor, in various ways, to prove the defamatory nature of the writings by extrinsic evidence. The extent to which language allegedly libelous per se is subject to such proof, as opposed to defamation by innuendo, is problematical; cf. *Harper & James, op. cit. supra,* at § 5.29, p. 465. In any event, the proof offered in the case at bar is not persuasive. There is no evidence of contemporaneous expressions of opprobrium directed at Ladany as the result of Groussard's book. Plaintiff submits a front-page picture from the weekend magazine "Yamim Ve Leylot" of June 18, 1976, taken from a movie on the massacre, and showing an athlete escaping from a balcony. The caption reads: "One of the Israelis (the sprinter Dr. Ladany) escapes from the building." (Ex. LL to Ladany affidavit). Ladany says in his affidavit (p. 36) that thousands of Israelis saw this photograph "depicting my supposedly cowardly escape." The supposition is the plaintiff's; no such accusation appears in the publication. Plaintiff's claims that he was turned down by various clubs in Israel and not chosen to represent Israel at a walking competition in Montreal in 1976 because of the book are conjectural. While Ladany's companions in Apartment No. 2 express, in their letters and statements, sympathy with Ladany over the statements made about him, it is apparent that Ladany had initiated these exchanges, presumably stating his own belief that he had been defamed. There is, in short, no independent and objective evidence that anyone, in fact, interpreted the book as depicting Ladany as a coward. No such indication appears in any of the numerous book reviews plaintiff submits. Ladany's affidavit (p. 35) complains of a serialization of the Morrow-

published book in the *London Sun,* which stated in part: "They reported seeing Shaul Ladany, the long-distance walker, from their apartment, tearing off down the street." (The reference is to Hershkowitz and Shtroh, reporting to Lalkin at the latter's apartment.) The affidavit omits the paragraph which immediately followed in the *Sun* serial (Ex. KK):

"Ladany had heard the noise earlier, guessed what had happened, and taken the opportunity to get away *and find the security people.*" (emphasis added).

The implication is one of a sensible determination to summon effective assistance, not cowardice.

**16.** § 50 provides:

"A person, firm or corporation that uses for advertising purposes, or for the purposes of trade, the name, portrait or picture of any living person without having first obtained the written consent of such person, or if a minor of his or her parent or guardian, is guilty of a misdemeanor."

§ 51 provides in part:

"Any person whose name, portrait or picture is used within this state for advertising purposes or for the purposes of trade without the written consent first obtained as above provided may maintain an equitable action in the supreme court of this state against the person, firm or corporation so using his name, portrait or picture, to prevent and restrain the use thereof; and may also sue and recover damages for any injuries sustained by reason of such use and if the defendant shall have knowingly used such person's name, portrait or picture in such manner as is forbidden or declared to be unlawful by the last section, the jury, in its discretion, may award exemplary damages."

adorn defendant's flour bags had no remedy. Chief Judge Parker said for the Court:

> "The legislative body could very well interfere and arbitrarily provide that no one should be permitted for his own selfish purpose to use the picture or the name of another for advertising purposes without his consent." 171 N.Y. at 545, 64 N.E. at 443.

The legislature responded to that suggestion at its next session, enacting §§ 50 and 51 of the Civil Rights Act.[17]

The New York courts, construing these enactments, have made it clear that "every unauthorized use of a name or picture in connection with trade or advertising does not imply a violation of the statute." *Damron*, n. 17 *supra*, at 231 N.Y.S. 445. In *Damron* the Court states generally:

> "The *Roberson* Case indicates the mischief to be suppressed, and the enactment leaves it to the common sense of judges and courts to determine the extent to which it is intended that the remedy shall be applied." *Ibid.*

The *Damron* case involved a suit against the author, publisher, and seller of a novel called "Show Boat." One scene was laid in Catlettsburg, Ky. Plaintiff alleged that, in that scene, his name was used without authority, and that he was made to appear as one of the characters. The Court granted defendants' motion to dismiss the complaint:

> "In determining whether a name or likeness is used primarily for advertising or trade, we may have to weigh the circumstances, the extent, degree, or character of the use. It is well established that every incidental mention of some person's name in connection with advertising or trade does not constitute a violation of the provisions under consideration. The single appearance of plaintiff's name in this book is clearly not a use prohibited

by the statute. Were we to take any other view, it is apparent that consequences never contemplated would follow from its enactment. It would indeed impose uncalled-for burden and hazard, were we to hold that publishers and book sellers could not lawfully publish or deal in books without the production of genuine written consents from everyone mentioned even once, or that an author could not lawfully mention anyone without like consent." *Id.* 231 N.Y.S. at 446.

Since *Damron* a number of New York cases have held that the *incidental use* of a person's name or photograph, even if unauthorized and fictionalized, falls outside the statute. In *Stillman v. Paramount Pictures Corp.*, 2 A.D.2d 18, 153 N.Y.S.2d 190 (1st Dept. 1956), *aff'd.*, 5 N.Y.2d 994, 184 N.Y. S.2d 856, 157 N.E.2d 728 (1959), the motion picture "Country Girl" contained one reference by a character, who said he could go to "Stillman's gym and get a punch-drunk fighter." The Court held that §§ 50 and 51 "do not prohibit the incidental, momentary and isolated use" of plaintiff's name. 153 N.Y.S.2d at 191. *University of Notre Dame v. Twentieth Century Fox*, 22 A.D.2d 452, 256 N.Y.S.2d 301 (1st Dept. 1965), *aff'd.*, 15 N.Y.2d 940, 259 N.Y.S.2d 832, 207 N.E.2d 508 (1965), involved a novel and motion picture based upon it, which told a fanciful tale concerning Notre Dame football. The president of Notre Dame, Father Theodore M. Hesburgh, was referred to by name at page 108 and pages 115–116 of the novel.[18] His complaint was dismissed: "In our opinion these isolated references are of that fleeting and incidental nature which the Civil Rights Law does not find offensive." Botein, P. J., at 256 N.Y.S.2d 304.

This Court has followed New York case law in holding that incidental use is not covered by the Civil Rights Act. In *Man v.*

---

17. The genesis of the statute is discussed in *Time, Inc. v. Hill*, 385 U.S. 374, 380–381, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967) and *Damron v. Doubleday, Doran & Co.*, 133 Misc. 302, 231 N.Y.S. 444 (Sup.Ct.N.Y.1928), *aff'd*, 226 App. Div. 796, 234 N.Y.S. 773.

18. The novel dealt with a football game arranged, for involved diplomatic reasons, between Notre Dame and a fictitious university in a mythical Arab country. Hesburgh was portrayed as "the University official with whom the State Department is in communication." 256 N.Y.S.2d at 304.

*Warner Bros., Inc.,* 317 F.Supp. 50, 53 (S.D. N.Y.1970), plaintiff was a professional musician whose performance at the Woodstock festival was included, without his consent, in a commercial film depicting the event. Judge MacMahon dismissed his complaint under the statute: ". . . the incidental use of plaintiff's forty-five second performance in defendants' motion picture of this public event is surely *de minimus*" (citing *University of Notre Dame* and *Damron, supra*).

Judge Tyler's opinion in *Meeropol v. Nizer,* 381 F.Supp. 29 (S.D.N.Y.1974), *aff'd on other grounds,* 560 F.2d 1061 (2d Cir. 1977), is instructive. Plaintiffs were the sons of Ethel and Julius Rosenberg. Louis Nizer wrote a book, "The Implosion Conspiracy," about the events surrounding the Rosenberg trial. The book contained references to the Rosenberg children, which plaintiffs made the basis of their claim under §§ 50 and 51. This Court rejected the claim:

> "Plaintiffs are not entitled to recover for an invasion of privacy because references to them as the Rosenberg children are highly incidental to the main purpose and subject of the book. Twenty-nine isolated references of a fleeting and peripheral nature are insufficient to support a claim under § 51. *University of Notre Dame, supra.*" 381 F.Supp. at 38.

In the case at bar, Groussard's book "The Blood of Israel," as published by Morrow, runs to 458 pages. The "cast of characters" listed in Appendix I, comprising those individuals referred to in the book, names 101 people, in categories: "Israelis in Olympic Village" (21); "Arab Guerrillas" (8); "Other Israelis" (16); "Germans" (32); and "Others" (24), a broad category ranging from Yasir Arafat, head of El Fatah, to Mark Spitz, the American Olympic swimmer, and Avery Brundage, the president of the International Olympic Committee, and Lord Killanin, his successor. The book concerns itself with the entire tragedy, of which the initial assault upon Block 31 is only the first scene. We are taken through the prolonged negotiations; the bloodbath at Furstenfeldbruch airport; and its aftermath. The book would appear to refer to virtually every individual who played any part in any aspect of the drama: athletes, terrorists, Olympic administrators, politicians, police, soldiers, airline personnel, diplomats, journalists, prosecutors.

References to Ladany appear on 13 of the 458 pages. As the quotations at pp. 872–874, *supra,* show, he was involved in only one scene in the narrative: the escape of the residents of Apartment No. 2. Once that early scene is completed, Ladany vanishes entirely from the book.

In these circumstances, and in accordance with the cited authorities, I hold that the references to Ladany in "The Blood of Israel," viewed in the context of the main purpose and subject of the book, are incidental and isolated, and fall outside the boundaries of §§ 50 and 51 of the Civil Rights Act. Accordingly the third and fourth causes of action fail.

Plaintiff's brief (Point III, pp. 53–56) stresses that Groussard's account of his "interviews" with Ladany, and of Ladany's actions purportedly based thereon, are false in certain respects, so that, to that extent, the account is fictionalized. That is undoubtedly true (see discussion at pp. 874–875, *supra*). Plaintiff further points out, correctly, that under New York law, whereas the "privacy" of a newsworthy person is not protected by the statute in respect of factual accounts, he does have a right of action if his name "is the subject of a 'fictitious' report or article." *Time, Inc. v. Hill, supra,* at 385 U.S. 384, 87 S.Ct. 534, 540, collecting New York cases at n. 9. However, that proposition does not alter the rule that the individual plaintiff must in fact be *"the subject"* of the work in question, in order to invoke the Civil Rights Act; nor does it affect the converse of that rule, which is that incidental use of a name is not covered by the statute. If the use is incidental, the fact that it is fictional is without legal significance. The uses made of plaintiffs' names in the *Damron, University of Notre Dame,* and *Stillman* cases, *supra,* were all fictional. The cases relied upon by Ladany, treated more fully in the

margin,[19] all involve situations where the plaintiff was the sole or a primary subject of the allegedly fictitious work. By no stretch of the imagination may Ladany be so characterized. The falsity of certain of the references to him [20] are insufficient to supply that essential prerequisite to invocation of this statute.

Plaintiff emphasizes that his name is mentioned on thirteen different pages, and that his background and actions are discussed in some detail. But applicability of the Civil Rights Act does not depend upon the number of times an individual's name appears in a work. Twenty-nine references to the Rosenberg children were insufficient to invoke the statute in *Meeropol, supra.* As Judge Tyler observed in that case, the dispositive question is the relationship of the references to a particular individual "to the main purpose and subject of the book." What is "incidental" cannot be determined without reference to the whole. In the case at bar, Ladany is involved in only one of many varied and complex scenes that unfolded as the tragedy of Munich ran its course. The case may fairly be analogized to participation in a single scene in a novel, held to be insufficient in *Damron, supra,* to state a cause of action under §§ 50 and 51.[21]

It would distort the purpose of the legislature, and create unsettling precedent, to hold that this individual, one of one hundred referred to in a detailed narrative, and involved in only one limited aspect of the overall account, fell within the statute. If Ladany were to be regarded as a subject of this particular book read as a whole, within the purview of §§ 50 and 51, it is difficult to define the boundaries of incidental use.

In considering the remedies of those whose names are used without their consent, one must keep in mind the distinction

---

**19.** Plaintiff relies upon *Spahn v. Julian Messner, Inc.,* 21 N.Y.2d 124, 286 N.Y.S.2d 832, 233 N.E.2d 840 (1967) (fictionalized and unauthorized biography of plaintiff, a well-known baseball player); *Sutton v. Hearst Corp.,* 277 App. Div. 155, 98 N.Y.S.2d 233 (1st Dept. 1950) (plaintiff, a wife and mother, was described in pictorial article in magazine as receiving a weekly rose from a prisoner of war to whom she was not married); *Krieger v. Popular Publications Inc.,* 167 Misc. 5, 3 N.Y.S.2d 480 (Sup. Ct.N.Y.1938) (sufficiency of complaint upheld where plaintiff, a professional boxer, alleged that his name was used in a story about boxing for "a character of prominence," and that his name appeared "in upwards of 100 instances"); *Smith v. Goro,* 60 Misc.2d 1011, 323 N.Y.S.2d 47 (Sup.Ct.N.Y.1970) (defendant's book, entitled "The Block," purported to depict living conditions in a particular slum block in the Bronx, and plaintiffs were all residents of that block); *Youssoupoff v. Columbia Broadcasting System,* 48 Misc.2d 700, 265 N.Y.S.2d 754 (Sup. Ct.N.Y.1965) (the participation of plaintiff, a Russian prince, was depicted in a fictionalized, televised account of Rasputin's assassination); *Goldberg v. Ideal Publishing Co.,* 210 N.Y.S.2d 928 (Sup.Ct.N.Y.1960) (plaintiff, a rabbi, was described in a "romance" magazine article as having, together with a minister and a priest, answered questions about sex, and was also described as having cooperated in the preparation of the article); *Metzger v. Dell Publishing Co.,* 207 Misc. 182, 136 N.Y.S.2d 888 (Sup.Ct.N.Y.1955) (defendant's magazine "Front Page Detective" featured a photograph of plaintiffs, teenage boys, in an article on street gangs, falsely suggesting that they were gang members); *Binns v. Vitagraph Co.,* 210 N.Y. 51, 103 N.E. 1108 (1913) (plaintiff, the wireless operator on the steamship *Republic* in collision with the steamship *Florida,* and the first individual to use a wireless set to summon assistance in a disaster at sea, was portrayed by an actor in defendant's series of picture films depicting the incident, plaintiff being featured in the first and last of the sub-series; plaintiff's name was also prominently used in advertisements distributed by defendant); *Sidis v. F. R. Publishing Corp.,* 113 F.2d 806 (2d Cir. 1940) (plaintiff, a famous child protege, was the "unwilling subject" of biographical sketches and a cartoon printed in defendant's magazine); *Garner v. Triangle Publications,* 97 F.Supp. 546 (S.D.N.Y.1951) (defendants' magazines published stories and photographs portraying plaintiffs as the principal participants in a murder).

**20.** While not essential to this holding, it is nonetheless the fact that Ladany's brief overstates the extent of the falsification. The brief argues (p. 56) that: "Plaintiff is *quoted* in the book as expressing to the author utter disregard for the safety of his teammates" (emphasis in original). The book does not admit of such a reading. See Point I *supra,* at pp. 13–15.

**21.** Different considerations would arise if by use of Ladany's photograph, or additional references to him in promotional materials, Morrow had sought to enhance the sale of the book. No such showing is made. Cf. *Binns v. Vitograph Co.,* n. 19 *supra.*

between the law of libel and the Civil Rights Act. The law of libel protects against *defamation;* the statute guards against *exploitation.* Thus a defamatory reference is actionable, even though it may be incidental to the work. However, if the references to an individual are not defamatory—and I have found in this case that they are not—then they must bear a more substantial relationship to the entire work than is demonstrated here, to constitute use of the name "for the purposes of trade" under the statute. Viewing the law of libel and the Civil Rights Act in their relationship to each other, the non-defamatory, incidental use of an individual's name, even if unauthorized and fictitious, is not actionable. It is for the legislature, and not the courts, to extend the statute to each and every unauthorized, fictitious reference to the name of an individual.[22]

Since I conclude that §§ 50 and 51 do not apply to this case, I do not reach the other questions that would arise were the statute applicable.

## CONCLUSION

Defendant's motion for summary judgment is granted. Plaintiff's cross-motion for partial summary judgment on issues of liability is denied. There being no cause for delay, the Clerk of the Court is directed to enter judgment dismissing the complaint. In the exercise of my discretion, I direct that each party bear its own costs.[23]

It is So Ordered.

---

22. "The Legislature, but not the courts, may widen the scope of the statute. We have only to consider whether in its present form it applies here." *Damron, supra,* at 231 N.Y.S. 445.

23. I exercise my discretion in respect of costs in this manner because of what I may reasonably assume to be the differential in financial resources between the parties, and because the references to plaintiff, while not actionable, were false and, I have also assumed, offensive to him personally.