**William Ross ADEY, Plaintiff,**

v.

**UNITED ACTION FOR ANIMALS, INC., et al., Defendants.**

**No. 70 Civil 2724.**

United States District Court,
S. D. New York.

June 25, 1973.

Carr, Bonner, O'Connell, Kaplan, Thompson & Diuguid, Washington, D. C., for plaintiff; Walter J. Bonner, Daniel R. Thompson, John T. Coyne, Washington, D. C., of counsel.

Williams, Connolly & Califano, Washington, D. C., for defendants; David N. Webster, Earl C. Dudley, Jr., Washington, D. C., of counsel.

## OPINION

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

EDWARD WEINFELD, District Judge.

A monkey's flight into space has landed in this Court as a libel suit because of its diversity jurisdiction. It is the aftermath of an experimental trip in which a fourteen pound monkey nicknamed "Bonny, The Space Monkey" was propelled into earth orbit on June 28, 1969. Bonny was strapped to a couch within a small space capsule. Its bonds permitted movement of its arms and head and slight movement of its legs.

The animal was heavily instrumented with several electrodes inserted into its brain, devices for measurement of blood pressure, heart rate and respiration attached, and a catheter inserted in its urinary tract. The trip, planned to last thirty days and designed to test the effect of prolonged weightlessness upon the monkey's sleep patterns and certain other physiological functions, came to a premature and ill-fated end when after eight days in space the monkey's condition began to deteriorate rapidly and it was brought to earth, where it soon died.

The plaintiff is a doctor and a professor engaged in medical research; he is the director of the Space Biology Laboratory of the Brain Research Institute at the University of California. He is a consultant to the National Aeronautics and Space Administration (NASA), which sponsored the trip; he was intimately involved in the planning and execution of the Bonny mission and prepared Bonny for the flight.

The defendants are Eleanor Seiling and MacDonald White, two ladies with rather strong views in opposition to the use of animals for experimentation purposes. They are founders, and respectively the unpaid president and vice president, of the defendant United Action for Animals, Inc. (UAA), a national nonprofit organization dedicated to the welfare of animals, with a membership of approximately 2,500.

Within a month after the flight, the defendants, in July 1969, published and caused to be distributed to the membership of UAA and to about 500 humane societies two documents entitled "Call to Action" and "UAA Report—Special Edition—The Ordeal of Bonny, the Space Monkey." The first urged the readers to write to their congressmen to "insist" that funds for animal experimentation be cut off. The second, the Report, consisted of fourteen printed pages and contained photographs and a commentary on the Bonny flight. The specific statements in those two publications

upon which plaintiff based his claim upon filing his suit are:

a. "Thus, for all Adey's expensive instrumentation and 'excellent data,' he really didn't know what was going on in his experiment, much less possess control over it. For any experiment to be *scientific*, it is absolutely essential that the experimenter be in full control of it. Adey's remark [1] calls into question the level of his own competence and the reliability of his techniques when he can express such satisfaction with data which fails to explain the most significant event of his experiment: Bonny's death." (Report, p. 3)

b. "Dr. W. Ross Adey is with the Brain Research Institute of the University of California at Los Angeles (UCLA). He has a long history of abuse of animals . . ." (Report, p. 3)

c. "The catheter in Bonny's bladder was supposed to measure the body's chemical changes caused by weightlessness. But Adey himself is well aware that such studies on a terrorized animal are rendered unreliable and invalid by the animal's fear. Some of Adey's cruelest experiments on animals involve vibration." (Report, p. 5)

d. "When the dimensions of the thinboned head of a 14-pound monkey like Bonny are compared with those of man, it is clear that the great need is for science to replace the kind of savagery practiced by Adey." (Report, p. 6)

e. "But as we see, in 1969 Adey's methods haven't changed for the better." (Report, p. 8)

f. "While Adey and his colleagues continue to cling to their old research methods, scientists at the University of Wisconsin have developed what they call a 'Neurister' which can func-

tion like the gray matter of the human brain." (Report, p. 8)

g. "THIS REMARK DEMONSTRATES PRETTY CLEARLY THAT ADEY'S EXPERIMENT ON BONNY WAS PURE SAVAGERY, NOT PURE SCIENCE." (emphasis in the original) (Report, p. 9)

h. "Over the years, well supplied with money from the U.S. Air Force and NASA, Adey has performed a wide variety of exceedingly cruel animal experiments, including the vibration of live animals with electrodes in their brains in the name of 'brain research.'" (Report, p. 12)

i. "Has Adey qualified himself to use this modern and precise research? Apparently not." (Report, p. 12)

j. "But while the National Aeronautics and Space Administration boasts some of the finest scientists in the world, this agency continues to support men like Dr. W. Ross Adey, who masterminded Bonny's flight, and his animal-using colleagues who use computers only for data processing of their same old animal experiments—or what can be called veterinary research." (Letter, front side)

Thus, in general, the publications questioned plaintiff's competence in the preparation of the Bonny flight, and charged that the Bonny experiment was cruel and abusive to animals; that it was "pure savagery"; and that plaintiff had a long history of abuse to animals, having "performed a wide variety of exceedingly cruel animal experiments." Plaintiff alleges that the statements were false and defamatory, published with actual malice, with knowledge that such statements were false or with the deliberate and malicious purpose and intent to injure him and to deprive him of his good name and reputation as an individual and a professional researcher. He seeks compensatory damages in the

---

1. This referred to a public statement attributed to Dr. Adey: "It is a complete mystery to me personally why the monkey should have gone so soon so fast."

**460**

sum of one million dollars and punitive damages in a like amount.

The defendants originally denied the statements were defamatory in reference to plaintiff; additionally, they pleaded affirmative defenses of truth, the privilege of fair comment and constitutional protection under the First and Fourteenth Amendments.

■ Upon the trial, the claim of alleged defamatory matter was narrowed. Plaintiff withdrew his allegations as to the statements designated above as subparagraphs (e), (f) and (i). The defendants conceded that the remaining statements complained of, with the exception of subparagraphs (c) and (j), were defamatory of plaintiff. As to the latter paragraphs, the defendants, while not retreating from their original position that they were not defamatory, acknowledged that a reasonable finder of fact could conclude they tended to derogate plaintiff's reputation. The issues to be decided by the Court have been further narrowed by the acknowledgment that plaintiff was a public figure and that the flight was a matter of pub-

lic interest. Indeed, this could not be challenged. The flight was widely publicized and received much attention by all the news media; it drew marked differences of opinion; many questioned the expenditure of ninety-two million dollars of government funds in the light of what they termed more pressing and desirable domestic and social welfare programs. The plaintiff's status placed upon him, under the rule established by New York Times Co. v. Sullivan,[2] the burden to prove with "convincing clarity"[3] that the defamatory matter was made "with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not,"[4] unless the constitutional privilege enunciated in that case is inapplicable— a claim made by plaintiff.

■ The plaintiff's contention that there is a category of libel which is beyond constitutional protection, as plaintiff terms it, "private libel," is based upon dictum in Mr. Justice Harlan's plurality opinion in Curtis Publishing Co. v. Butts,[5] which suggests such an excep-

2. 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed. 2d 686 (1964). The development of the *Times* doctrine can be traced through the following decisions: Garrison v. Louisiana, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964); Linn v. United Plant Guard Workers, 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966); Rosenblatt v. Baer, 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966); Time, Inc. v. Hill, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967); Curtis Publishing Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) (extended the *Times* rule to public figures); Beckley Newspapers Corp. v. Hanks, 389 U.S. 81, 88 S.Ct. 197, 19 L.Ed.2d 248 (1967); St. Amant v. Thompson, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968); Greenbelt Cooperative Publishing Ass'n v. Bresler, 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970); Monitor Patriot Co. v. Roy, 401 U.S. 265, 91 S.Ct. 621, 28 L.Ed.2d 35 (1971); Time, Inc. v. Pape, 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971); Ocala Star-Banner Co. v. Damron, 401 U.S. 295, 91 S.Ct. 628, 28 L.Ed.2d 57 (1971); Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971).

3. 376 U.S. at 285–286, 84 S.Ct. 710; *see* Goldwater v. Ginzburg, 414 F.2d 324, 341 (2d Cir. 1969), cert. denied, 396 U.S. 1049, 90 S.Ct. 701, 24 L.Ed.2d 695 (1970). The phrase "clear and convincing proof" was later adopted. *See* Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 30, 52, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971).

4. 376 U.S. at 280, 84 S.Ct. at 726.

5. 388 U.S. 130, 154–155, 87 S.Ct. 1975, 1991 (1967):
"The courts have also, especially in libel cases, investigated the plaintiff's position to determine whether he has a legitimate call upon the court for protection in light of his prior activities and means of self-defense. . . . We note that the public interest in the circulation of the materials here involved, and the publisher's interest in circulating them, is not less than that involved in *New York Times*. And both Butts and Walker commanded a substantial amount of independent public interest at the time of the publications; both, in our opinion, would have been labeled 'public figures' under ordinary tort rules. . . . Butts may have attained that status by

tion may be warranted depending upon the relative opportunities of the public figure and the private individual to rebut the charges which constitute the alleged libelous material. Based thereon, plaintiff claims that since the UAA publications were mailed to its 2500 members and 500 selected organizations and were not distributed publicly, and not possessing a list of those receiving the documents, he did not have an opportunity to respond to the charges;[6] accordingly, he urges that the defense of constitutional privilege is unavailable to these defendants.[7]

I find this attempt to engraft an exception to the constitutional privilege, so strongly enunciated under *New York Times* and its progeny, without substance for a number of reasons. First,

the Supreme Court, as plaintiff's counsel recognize, has never ruled directly on this issue. Moreover, considering the First Amendment basis of the *New York Times* decision and that Court's recognition "of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials."[8] only the clearest doctrinal trend .favoring the exception would justify a district court judge in affording it recognition.[9] No such trend is discernible.[10]

Second, Dr. Adey, in view of his official status with NASA and his leadership in the preparation of Bonny for the flight, clearly comes within the defini-

position alone and Walker by his purposeful activity amounting to a thrusting. of his personality into the 'vortex' of an important public controversy, but both commanded sufficient continuing public interest *and had sufficient access to the means of counterargument* to be able 'to expose through discussion the falsehood and fallacies' of the defamatory statements. . . ." [Emphasis added.] *See also* Time, Inc. v. Hill, 385 U.S. 374, 391, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967).

6. However, Dr. Adey testified that he never requested a mailing list from the defendants.

7. Recently the New York Court of Appeals rejected a somewhat similar argument with respect to a congressman's press release to his constituents. Trails West, Inc. v. Wolff, 32 N.Y.2d 207, 344 N.Y.S.2d 863, 298 N.E.2d 52 (1973). It should be noted that previously when the word private was used in the libel area, it appeared to refer to the subject matter or target of the alleged defamatory statements, not to the audience receiving them. *See* Ocala Star-Banner Co. v. Damron, 401 U.S. 295, 300, 91 S.Ct. 628, 28 L.Ed.2d 57 (1971); Monitor Patriot Co. v. Roy, 401 U.S. 265, 91 S.Ct. 621, 28 L.Ed.2d 35 (1971); *cf.* Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 44 & n. 12, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971); Buckley v. Esquire, Inc., 344 F.Supp.

1133, 1134 (S.D.N.Y.1972); Trails West, Inc. v. Wolff, *supra.*

8. 376 U.S. at 270, 84 S.Ct. at 721.

9. Note that Justice Harlan in *Butts* stated that "[n]othing in this opinion is meant to affect the holdings in *New York Times* and its progeny . . . ." 388 U.S. at 155, 87 S.Ct. at 1992.

10. This Court is aware of recent holdings that the constitutional protection is not available where the defamatory material is contained in a private subscription credit report distributed only to the mercantile agency's subscribers. *E. g.,* Kansas Elec. Supply Co. v. Dun & Bradstreet, Inc., 448 F.2d 647 (10th Cir. 1971), cert. denied, 405 U.S. 1026, 92 S.Ct. 1289, 31 L.Ed.2d 486 (1972); Grove v. Dun & Bradstreet, Inc., 438 F.2d 433 (3d Cir.), cert. denied, 404 U.S. 898, 92 S.Ct. 204, 30 L.Ed.2d 175 (1971); Hood v. Dun & Bradstreet, Inc., 335 F. Supp. 170 (N.D.Ga.1971). However, the material disseminated by the defendants in the case at bar is not of the confidential and restricted nature as was that involved in the above cases; nor did they deliberately attempt to prevent anyone interested from obtaining the publications; further, as stated *infra*, plaintiff possessed the means to respond to the defendants' charges. *Compare* Grove v. Dun & Bradstreet, Inc., *supra,* 438 F.2d at 437. *See* 404 U.S. at 906, 92 S.Ct. 204 (Douglas, J., dissenting from denial of certiorari).

tion of a public official (as distinguished from a public figure).[11] As a public official he had access to the "means of counterargument."[12] The Bonny flight attracted so much publicity and aroused such controversy that there can be little doubt Dr. Adey readily could have commanded news media interest and availed himself of a public forum to answer the attack of the defendants. After Bonny's death the venture remained one of continuing public interest and controversy, including a congressional inquiry into such experiments, at which Dr. Adey appeared as a witness.[13] Moreover, he could, without difficulty, have reached his professional colleagues and the university community. And even if Dr. Adey could not have commanded equal media attention in efforts to negate the defendants' charges, this would not diminish the defendants' constitutional protection. As Mr. Justice Brennan recognized: "[I]t is the rare case where the denial overtakes the original charge. Denials, retractions and corrections are not 'hot' news. . . . [T]he unproved, and highly improbable, generalization that an as yet undefined class of 'public figures' involved in matters of public concern will be better able to respond through the media than private individuals also involved in such matter seems too insubstantial a reed on which to rest a constitutional distinction."[14]

Finally, as plaintiff's counsel conceded in response to the Court's inquiry, if these defendants, instead of distributing the publication to their own membership, urging them to write to members of Congress, had advertised in a newspaper or broadcast an appeal to the public to do so, they would qualify for the constitutional protection. It would indeed be a strange and anomolous doctrine to deprive them of that protection because they limited the "Call to Action" to fellow members interested in animal welfare instead of broadcasting it to the general public. In sum, the Court holds that since plaintiff was a public figure and the publications involved matters of public concern and controversy, defendants are entitled to rely upon the defense of constitutional protection under the First Amendment.

Accordingly, we turn to the basic issues. The task of the Court as the fact finder has been simplified by counsel, who with a fine professional attitude concurred in the view that the Court first consider whether plaintiff has carried his burden on the "knowing or reckless-falsity" issue by that "clear and convincing proof"[15] required under the constitutional standard. In the event he had failed to sustain this burden, the parties are agreed there would be no need to pass upon the alleged falsity of the defamatory statements or those claimed to be so, or to consider the defenses of truth and fair comment.

11. "Public officials" are so labelled by reference to their position and responsibility in government. See Rosenblatt v. Baer, 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966); New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); see also Barr v. Matteo, 360 U.S. 564, 572–575, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959). One who does not hold a place in government, and yet commands substantial public interest either by position in the community alone, or by "purposeful activity" is subject to the "public figure" classification. See Curtis Publishing Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967); cf. Spahn v. Julian Messner, Inc., 18 N.Y.2d 324, 274 N.Y.S.2d 877, 221 N.E.2d 543 (1966).

vacated and remanded on other grounds, 387 U.S. 239, 87 S.Ct. 1706, 18 L.Ed.2d 744 (1967).

12. Curtis Publishing Co. v. Butts, 388 U.S. 130, 155, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967).

13. See Hearings Before the Subcomm. on Space Science & Applications of the House Comm. on Science & Astronauts, 91st Cong., 1st Sess. (1969). The hearings were conducted during mid-November 1969.

14. Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 46–47, 91 S.Ct. 1811, 1821, 29 L.Ed.2d 296 (1971).

15. Id. at 30, 52, 91 S.Ct. 1811.

Plaintiff does not contend, and the evidence does not support a finding, that the defendants acted with actual knowledge that the defamatory material was false. The issue rather is whether the defendants acted with "reckless disregard of whether it was false or not." The Court, as the finder of fact, "must determine whether the publication was indeed made in good faith."[16] There is, of course, no precise yardstick to determine the issue with each case turning upon its own individual facts. As was recognized in St. Amant v. Thompson, "[r]eckless disregard . . . cannot be fully encompassed in one infallible definition."[17] However, the facts of that case give direction as to what is required to establish reckless disregard. The Louisiana Supreme Court based its ruling that St. Amant had broadcast false information about Thompson recklessly (though not knowingly) upon several factors, including: (1) St. Amant had no personal knowledge of Thompson's activities; (2) he relied solely upon an individual's affidavit, although there was no evidence of that person's reputation for veracity; (3) he failed to verify his information with those who might have known the facts; and (4) he gave no consideration to whether or not his statements defamed plaintiff and went ahead heedless of the consequences.[18] The Supreme Court held that those considerations fall short of proving the defendant's reckless disregard for the accuracy of his statements about plaintiff. The Court, citing its own leading cases on the subject,[19] as furnishing meaningful guidance, stated they make it "clear that reckless conduct is not measured by whether a reasonably prudent man[20] would have published, or would have investigated before publishing," but that there "must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication."[21] Finally, it cautioned that mere profession by a defendant of good faith or that he believed his statements were true would not be a sufficient defense, especially if his statements are a "product of his imagination" or so "inherently improbable that only a reckless man would have put them in circulation."[22] Thus, the issue here is not whether the admittedly defamatory statements or the others as to which there is an issue were true,[23] or were defendants' views of plaintiff and his experiments justified, or whether they should have been verified prior to publication—rather it is whether in fact they

16. St. Amant v. Thompson, 390 U.S. 727, 732, 88 S.Ct. 1323, 1326, 20 L.Ed.2d 262 (1968).

17. 390 U.S. 727, 730, 88 S.Ct. 1323, 1325 (1968).

18. *Id.*

19. New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (plaintiff failed to satisfy his burden because the record failed to show that the publisher was aware of the likelihood that he was circulating false information); Garrison v. Louisiana, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964) (necessity for showing that a false publication was made with a "high degree of awareness of . . . probable falsity"); Curtis Publishing Co. v. Butts, 388 U.S. 130, 153, 87 S.Ct. 1975, 1990, 18 L.Ed.2d 1094 (1967) ("despite the publisher's awareness of probable falsity," evidence of either deliberate falsification or reckless publication was essential to recovery by public officials).

20. The Court has firmly adhered to its rejection of the "reasonably prudent man" standard in order to assure full protection under the First Amendment. *See* Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 52, 56, 91 S.Ct. 1811, 29 L.Ed. 2d 296 (1971); New York Times Co. v. Sullivan, 376 U.S. 254, 287–288, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

21. 390 U.S. at 731, 88 S.Ct. at 1325.

22. *Id.* at 732, 88 S.Ct. at 1326.

23. "Truth or falsity . . . is not the constitutional test." Bon Air Hotel, Inc. v. Time, Inc., 426 F.2d 858, 867 (5th Cir. 1970). *See* New York Times Co. v. Sullivan, 376 U.S. 254, 271, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); Time, Inc. v. McLaney, 406 F.2d 565, 570 (5th Cir.), cert. denied, 395 U.S. 922, 89 S.Ct. 1776, 23 L.Ed.2d 239 (1969).

seriously doubted the accuracy of their statements about plaintiff.[24]

■ A review of all the relevant trial evidence, including the demeanor of witnesses, compels a finding that the plaintiff has failed to sustain his burden of proof. The evidence does not establish with "convincing clarity" that the defendants entertained serious doubts as to the truth of their statements or that they had "a high degree of awareness of their probable falsity." To the contrary, they asserted their continuing belief that the statements in the UAA publications were true and the evidence supports a finding that it was a sincere and genuinely held view. This belief was not drawn out of thin air or a product of their imaginations or contrived as a defense to plaintiff's charge. The individual defendants have been associated with what is referred to as the humane movement for many years and the UAA was organized under their sponsorship in 1967 to disseminate information of alternatives to the use of animals in research. Simply stated, they are opposed to the use of animals in reasearch based upon a firm belief that effective alternative methods of research are available. Literature and bulletins pertaining to the subject of the defendants' main interest are distributed fairly regularly to the UAA's approximately 2500 members and about 500 humane societies. The defendant Seiling, in pursuit of her interest in the welfare of animals, has through the years collected articles written and published by various experimenters, including a number by Dr. Adey. The collection includes many papers on alternative methods to the use of animals for experimentation, such as physical and mathematical modeling, tissue and culture techniques and modern and sophisticated instruments. Some of the material comes from the United States Department of Commerce which issues technical journals; also from medical, scientific and technical articles on animal and non-animal techniques.

The articles here at issue were prepared in the main by the defendant Seiling with the research and editorial assistance of the defendant White. In large measure, they relied upon their general store of information contained in the accumulated library material. A principal thrust of the publications was that Bonny had suffered and died in vain—it was directed against experimenters' adherence to medicine's age-old techniques and tradition in the use of animals for research instead of the use of more modern and technical methods. In substance, they charged that countless other animals will continue to suffer and die because, as defendants stated: "[The] nation's military-space research on biological systems is being done by animal experimenters using outdated methods instead of by scientists educated to use advanced techniques." The statements in the publications as to Dr. Adey were subjective conclusions based upon substantially accurate information on the "technical" aspects of the Bonny experiment, and statements by persons in the same and related fields of study as the plaintiff, as well as articles written or co-authored by Dr. Adey during the period from 1956–1965. We need only examine brief excerpts, cited below, of those articles by Dr. Adey to appreciate the impact upon, and the reaction of, the defendants or the average layman concerned with the welfare of animals, after reading them:

(a) In discussing an experiment in which portions of phalangers' brains were removed, references were made to "roughly assault[ing the animals] with a large cloth bundle"; the application of "noxious stimuli"; the ani-

24. See Waskow v. Associated Press, 462 F.2d 1173, 1175 (D.C.Cir. 1972) (per curiam); Bon Air Hotel, Inc. v. Time, Inc., 426 F.2d 858, 866 (5th Cir. 1970). In the case at bar, the Court is dealing to a large extent with charges of cruel-

ty, savagery and abuse to animals— accusations which cannot be objectively analyzed in the same manner as charges of criminal conduct, unfitness to hold office or matters of public health.

mals experiencing frequently generalized convulsions, and that the animals were "prodded with a stick" or subjected to "painful stimulation of the tail or paw."

(b) In describing the results of an experiment which involved injecting calcium chloride into a cat's brain tissue it was stated: "With repeated injections of calcium chloride . . . epileptic seizures were observed after three to five injections. In some cases, generalized convulsions led to the death of the animals."

(c) One article, describing experiments during which monkeys were subjected to varying degrees of vibration, mentioned "one instance, [where] the anesthetic state was terminated by intracardiac injection of potassium chloride, which produced cardiac arrest."

(d) Two articles describe the effects of various drugs, including LSD 25, on cats' behavior. There are references to the cats exhibiting "bizarre" behavior; statements that the animals remained in "catatonic postures" and shook their heads "violently against unseen objects."

In addition to the foregoing, the accounts of the Bonny experiment describe the surgical implantation of electrodes into the monkey's brain and catheters into its main arteries, inserted through its upper legs.[25] Moreover, since we are dealing with defendants' state of mind, it is significant that defendant Seiling's opinion was that *any* animal experimentation is "savage" and "cruel" since she believes there are adequate alternative methods of research. Finally, evidence was introduced which demonstrated that plaintiff's experiments were subject to criticism, direct and indirect, from other observers, including professional contemporaries of plaintiff, who differed with him. The opinion the defendants had of the experiment and the methods used to instrument the monkey was one on which reasonable persons, professional and lay, could have differing points of view. The above convincingly establishes that defendants' statements and conclusions were not wholly fabricated nor inherently improbable.[26] In sum, the Court finds that while the publication used strong and robust terms, it was made in good faith.

Men in public life, whether they be judges, legislators, executives or scientists, must accept as an incident of their service harsh criticism, ofttimes unfair and unjustified—at times false and defamatory—and this is particularly so when their activities or performance may be the subject of differing attitudes and stir deep controversy. While it is not pleasant to be the target of false and defamatory charges, officials must be "able to thrive in a hardy climate,"[27] and their personal injury and hurt must yield to the higher purpose of assuring citizens freedom of expression. Dissent and the right to criticize those in public life are of the essence of the democratic process.[28] It is only when false, defamatory matter is rooted in actual malice

25. At trial Dr. Adey explained the significance of several statements in his articles—i. e., that "painful stimulation" consisted of squeezing the tail or paw of the animal, and that mention of epileptic discharge and seizures in one article did not relate to visible ("clinical") epileptic "fits". Defendants, however, did not have the benefit of these explanations when the publications in issue were written and it is their state of mind at that time which is controlling.

26. At least one of defendants' statements [(a) in the complaint] questions the plaintiff's professional competency. However, such statements were not wholly unreasonable in light of Dr. Adey's own statement that it was a "complete mystery" to him why Bonny "should have gone so soon so fast" and the general criticism of his experiments.

27. Craig v. Harney, 331 U.S. 367, 376, 67 S.Ct. 1249, 1255, 91 L.Ed. 1546 (1947).

28. *Cf.* Garrison v. Louisiana, 379 U.S. 64, 74–75, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964).

that the constitutional privilege must yield. This is not such a case.[29]

Judgment may be entered in favor of the defendants in accordance with the foregoing.

The foregoing shall constitute the Court's Findings of Fact and Conclusions of Law.

---

29. Plaintiff places substantial reliance on Goldwater v. Ginzburg, 414 F.2d 324 (2d Cir. 1969), cert. denied, 396 U.S. 1049, 90 S.Ct. 701, 24 L.Ed.2d 695 (1970). However, this Court does not find that decision to be controlling in light of the significant differences in the evidence adduced in each case. At best, plaintiff has established circumstances similar to those in the *St. Amant* case, which, as noted previously, the Supreme Court determined were inadequate to sustain a finding of reckless disregard.

Also inapposite are the decisions in Varnish v. Best Medium Publishing Co., 405 F.2d 608 (2d Cir. 1968), cert. denied, 394 U.S. 987, 89 S.Ct. 1465, 22 L.Ed.2d 762 (1969) (author's reliance upon presumptions and distortion), and Airlie Foundation, Inc. v. Evening Star Newspaper Co., 337 F.Supp. 421 (D.D.C. 1972) (actual awareness of information which would cause serious doubt as to the validity of the charges made against the plaintiff).