HAMMERHEAD ENTERPRISES, INC.,
Ronald Pramschufer, and Robert
Johnson, Plaintiffs,

v.

Stanley BREZENOFF, Mayor and City
Council, and the City of New
York, Defendants.

No. 81 Civ. 3054 (MP).

United States District Court,
S.D. New York.

Dec. 6, 1982.

**1362**

Luther C. West, Baltimore, Md., David Tichane, Brooklyn, N.Y., for plaintiffs.

Frederick A.O. Schwarz, Jr., Corp. Counsel by George Gutwirth, New York City, for defendants.

## DECISION AND OPINION

### MILTON POLLACK, District Judge.

This suit was instituted for injunctive relief and compensatory and punitive damages for alleged defamation, and interference with commercial relations and with free speech. The claims were heard at a Bench trial without a jury. Jurisdiction of the Court is posited on diversity, 28 U.S.C. § 1332, and Civil Rights 42 U.S.C. § 1983, 28 U.S.C. §§ 1343(3) and (4).

*The Claims Asserted*

On May 20, 1981, plaintiffs instituted this suit against Stanley Brezenoff, individually and in his official capacity as Administrator of the Human Resources Administration and Commissioner of Social Services of the City of New York, against the Mayor and the City Council of New York City and against the City of New York.

The occasion for the suit was a letter written about an adult parlor game created and marketed by the plaintiffs. On November 5, 1980, Mr. Brezenoff sent a letter to the chief executive officers of thirteen department, toy and book stores with headquarters in the greater New York area. Mr. Brezenoff's letter [1] criticizes a so-called "spoof"—a board game entitled, *"Public Assistance: Why Bother Working for a Living?"* (Public Assistance) which was invented, manufactured and marketed by the plaintiffs, Ronald Pramschufer, Robert Johnson, and Hammerhead Enterprises, Inc.[2]

At the close of trial, the Court dismissed the claims against the Mayor of New York City, the City Council, and the City of New York as defendants; no evidence was adduced that these parties knew of the letter or were involved in the events leading to this dispute; what evidence there was in these areas was conclusive that those defendants had no knowledge or involvement

---

1. The text of the letter reads as follows:

As you may know, there is a new board game on the national retail market called "Public Assistance." I am writing to urge that [    ] refrain from carrying this game in its stores.

"Public Assistance" is not, as its inventors claim, a harmless spoof of welfare cheats and liberal government bureaucrats. It is an ugly and damaging slam at this society's poorest citizens, 60 percent of whom are children.

A welfare family of four in New York City receives public assistance and food stamp benefits of $374 a month to cover everything—food, clothing, utilities, carfare, and other necessities—except rent and medical care. That works out to about $3.01 per person per day. The maximum the family can receive for rent is $218 monthly.

Besides lampooning the painful financial situation of those who struggle to get by on that amount in this economy, the game also denigrates the very real progress over the past decade in reforming administration and management of the welfare system. Locally, error rates in payment and eligibility are now a fraction of what they were just seven years ago;

caseloads are down to their lowest levels since 1972; and more able-bodied welfare recipients are being removed from the rolls and put to work in productive jobs than at any other time in the City's history.

The system is still imperfect, but we are working hard to improve it, and the "welfare mess" of the old days is gone.

By perpetuating outdated myths, I believe the "Public Assistance" game does a grave injustice to taxpayers and welfare clients alike; by its insensitivity and plain shoddiness, it is a discredit to those associated with its manufacture and marketing.

Your cooperation in keeping this game off the shelves of your stores would be a genuine public service.

With thanks and best wishes.

Sincerely,
Stanley Brezenoff
Administrator/Commissioner

2. Hammerhead is a Maryland corporation created for the purpose of inventing and selling board games.

in any of the matters dealt with herein. Decision was reserved as to the individual liability of Mr. Brezenoff, who, being the only one remaining before the Court will be referred to as the defendant.

The proof presented at the trial consisted of testimony of witnesses, depositions and exhibits. On due deliberation and weighing the evidence, circumstances and probabilities and assessing the credibility of witnesses, judgment must be entered in favor of the defendant due to the failure of the plaintiffs to carry their burden of proof to establish any of their claims by a fair preponderance of the credible evidence.

## I. The Game

"Public Assistance" falls into the broad genre of parlor board games epitomized by "Monopoly". While circling the playing board, each player attempts to accumulate simulated money by remaining on welfare and avoiding work. Plaintiffs describe their game as a "spoof", "a commercial satire" on the welfare system in that it lampoons able-bodied welfare recipients and public administrators. In essence, in Mr. Brezenoff's opinion, the game portrays welfare clients as lazy, loafing, intoxicated, dishonest; and promiscuous, describes welfare administrators as lazy dupes of the clients; and suggests that politicians indiscriminately heap benefits upon welfare recipients. The game also plainly makes derogatory reference to "ethnic lawyers" and "landlords", to crime as an income supplement to welfare benefits and to the financial benefits under the welfare system of having illegitimate children. Plaintiffs have stipulated that they have no expertise in welfare matters; that they do not consider themselves experts, or even knowledgeable about welfare issues.

At the games' inception in the early fall of 1980, the plaintiffs did not allocate any funds for advertising nor did they have a formal marketing or media strategy. Nonetheless, plaintiffs testified that they hoped and anticipated that some individuals would enjoy and support the game while others would oppose it. Plaintiff Johnson testified that the game concerned a great public issue in this country and that it would elicit response. Plaintiffs attempted to evoke this response in October 1980 by contacting local Maryland newspapers to request that they publish articles concerning the game. Moreover, Mr. James Dunnigan, plaintiffs' expert on the marketing of games testified that the game was highly marketable due to its controversial nature: it would appeal to some and turn others off.

Some of those who were turned off publicly voiced their opposition, displeasure and disgust concerning the game and its tart message prior to November 5, 1980. Secretary of Health and Human Resources, Patricia Harris, publicly deplored the game "as callous, sexist and racist," and as a "vicious brand of stereotyping". Carl Snowden, a leader of a local anti-poverty group in Annapolis, Maryland, pronounced the game "obnoxious and close to bordering on racism". Snowden was quoted as calling for the Maryland and Washington National Association for the Advancement of Colored People to consider a boycott of the game. The game has attracted negative comment from the National Organization for Women and from the National Association of Social Workers.

The game, plaintiffs' statements to the media and the above and other public reactions generated widespread media coverage of the controversy surrounding the game. Stories concerning the game and its criticism were reported locally in many cities and nationally by the Associated Press. Plaintiff Johnson and Carl Snowden appeared on the nationally televised "Donahue segment" of the "Today Show" prior to November 5, 1980 to comment and be interviewed on the game and the political and social views espoused thereby. Some of the media coverage mentioned possible boycotts of the game.

The individual plaintiffs both testified that they believed that the statements found on the game board and on cards contained in the game—in their opinion—accurately or nearly accurately portrayed abuses that existed in the welfare system.

They further contended that they sought to exploit and lampoon these alleged abuses to make money from the sale of their game.

Based on the exhibits, the testimony of witnesses including that of the plaintiffs and an assessment of the credibility of that testimony, the Court finds that by the plaintiffs' own conduct they have thrust themselves into the general public controversy and its political and social ramifications concerning welfare and into the forefront of the specific public controversy concerning the appropriateness and good taste of board games and pretended "spoofs" that reflected on and criticized the recipients of and manner in which public assistance is afforded, administered and used. Plaintiffs' purpose was to foment that controversy by taking a distinct political and social position in order to influence and augment sales of the game. During the Fall of 1980, the plaintiffs had repeated and continuing access to local and national media and were in position to promote and defend their game against attacks.

## II. Purpose and Intent of the Brezenoff Letter

Acting on his own initiative, with the editorial assistance of his secretary, Stanley Brezenoff, on his official stationery of Administrator/Commissioner of the Human Resources Administration, wrote the form letter quoted at footnote 1 above to thirteen chief executives of retail establishments consisting of department, toy and book stores in the New York City area on November 5, 1980.[3] On its face there is nothing libelous in the letter, nor are the words and phrases defamatory or those normally used to intimidate or threaten. The plaintiffs nonetheless claim to be particularly offended by the last two paragraphs of the letter:

By perpetuating outdated myths, I believe the "Public Assistance" game does a grave injustice to taxpayers and welfare clients alike; by its insensitivity and plain shoddiness, it is a discredit to those associated with its manufacture and marketing.

Your cooperation in keeping this game off the shelves of your stores would be a genuine public service.

Whether or not these paragraphs are libelous, tortious or of a quality that threatens or intimidates the letter's recipients depends on an examination of the totality of the circumstances surrounding the letter and its effect and by contemplation of the writer's intent and the reaction of its recipients.

There is no credible evidence that the defendant acted out of spite or with ill-will toward any of the plaintiffs. He did not know the plaintiffs; he was unfamiliar with the game prior to encountering it at a social cocktail party in late October 1980, in Washington, D.C.; he had no knowledge concerning the marketing of games in general or of "Public Assistance" in specific.

The Court finds that Mr. Brezenoff was motivated in good faith by his concern for and support of the concept of public assistance and his desire to rebut undeserved barbs and factual representations made by the game that he considered to be erroneous, derogatory, unfair and counterproductive. The Brezenoff letter was well within the scope of his station as the top administrator of public assistance in New York City to comment on controversies surrounding public assistance recipients or administrators. The game was released at a time when there was nationwide controversy and partisan hostility to welfare benefits in general and when important State legislation was pending. The defendant had frequently engaged in the public debate concerning public welfare in the media and by lecturing on the subject. He had the responsibility to express Agency policy on social service issues and the integrity of its administration and to inform the public concerning the programs of his Agency.

---

**3.** The stores are: Abraham and Strauss; Alexander's; B. Altman & Co.; Bloomingdale's; Gimbel's; Hammacher-Schlemmer; Lord & Taylor; Macy's; Saks Fifth Avenue; F.A.O. Schwartz; Brentano's; Barnes and Noble; and Toys-R-Us.

The Court sees nothing sinister in the defendant's chosen avenue for comment on the game.[4] Plaintiffs complain that defendant's actions constitute "covert reportage" and therefore demonstrate ill-will. The Court is convinced that Mr. Brezenoff in good faith felt that a letter to game retailers was an appropriate forum in which to respond to the accusations and "spoofs" promulgated by the game. He was unaware that there had been substantial media coverage of the game and he felt that a letter to newspapers would be insufficient and would probably remain unpublished as a debate over the promotion of a commercial vehicle.

The plaintiffs submitted the testimony of an unemployed, self-styled investigative reporter for a political news sheet, one Cathy Groudine, to indicate that there was something surreptitious about the letter. She claimed that when she learned of the letter she tried to obtain a copy and had difficulty in obtaining one. From this, she concluded that the defendant tried to cover up the existence of the letter. However, the credible evidence on this side foray supports a contrary conclusion. Ms. Groudine's testimony only demonstrated her inability to personally speak to the defendant. On January 31, 1981, the defendant's staff promptly complied with a request received pursuant to New York City's Freedom of Information procedures and sent a copy of the letter to Ms. Groudine.

The letter did not express any factual information which was knowingly false or stated with a reckless disregard for its veracity. The defendant's conduct was neither negligent, reckless, nor grossly irresponsible. The credible evidence proves that the letter constitutes a combination of legitimately held opinion and unassailed facts. The bulk of the letter contains factual statements concerning the size of welfare benefits, the demographic make-up of the welfare rolls and an evaluation of administrative efforts to reduce welfare abuses. Plaintiffs offered no credible evidence to dispute these representations and they were not intended as defamatory nor are they libelous.

The defendant stated it as his opinion that the perpetuation of myths that are inconsistent with the facts as he viewed them does a grave injustice to taxpayers and welfare recipients, that the game is insensitive and shoddy as well as a discredit to its manufacturers and marketers. The defendant offered his opinion that it would be a genuine public service for merchants not to sell such merchandise. Such an opinion could be and was honestly and reasonably held and could be freely spoken by a person in Mr. Brezenoff's position without recrimination.

Given the totality of the circumstances surrounding the letter, the defendant's expertise as to factual matters concerning welfare and the specificity of the factual presentation in the rest of the letter, the last two paragraphs must be read as the type of "rhetorical hyperbole" that characterizes opinion. Moreover, it is obvious that the basis for defendant's opinion in the last two paragraphs is the set of facts described in the remainder of the letter.

Mr. Brezenoff was justified in making an opinionated response to the game. As Administrator of Human Resources, he spoke for two constituencies that were directly assaulted by the game and its implications. Mr. Johnson admits that it was the plaintiffs' goal to "make people mad" in order to sell games. The defendant's retort to the provocation in plaintiffs' attack was a reasonable reaction and not excessive. At times plaintiffs testified that part of their complaint with the defendant was that his retort was not as vocal nor as vociferous as those of Patricia Harris, et al. The Court finds that it was reasonable for the defendant to comment on the game, that his comment was reasonably restrained and that he chose an entirely proper means to voice his reactions to the game.

---

4. Nor does the subsequent mailing of a copy of the letter to Edward T. Weaver, executive director of the American Public Welfare Association demonstrate any impropriety. The suggestion of a conspiracy between Brezenoff and Weaver strains credulity and is not credited.

Finally, the defendant's lack of a motive to injure plaintiffs rather than to address the game itself, is illustrated by his complete failure to engage in any follow up on the letter. The plaintiffs voice the notion that the letter carried an implication to the retailers of a threat of governmental harassment to them. Mr. Brezenoff did nothing to apprise others in any department of the City of his response or to invite any sort of governmental coercion to inhibit sales. He wrote no other letters and took no other action. Only two of the thirteen recipients even acknowledged receipt of the letter. In each of those cases the recipient applauded Mr. Brezenoff's viewpoint. The defendant's testimony that his sole purpose was to respond, not to censor, is accepted as entirely credible. Once he said what he had to say he took no further action to inhibit plaintiffs' sales.

### III. Impact of the Letter

Perhaps most damaging to the plaintiffs' case is their failure to present credible evidence that any potential distributors of the game refrained from marketing it because of the Brezenoff letter. Plaintiffs attempted to make that suggestion through Mr. Michael Botti, a buyer for Brentano, who testified that he felt an implied threat from the letter and that this feeling influenced Brentano's decision in 1980 not to sell the game. Mr. Botti was unable to point to any specific language in the letter or subsequent actions of the defendant which he felt were threatening or intimidating. Mr. Botti's testimony was not worthy of belief; he was confronted with and directly contradicted by a letter from his own superior, Ms. Monica Hollander to Mr. Brezenoff dated November 13, 1980, stating on behalf of Brentano that Mr. Botti had refused to consider the game for purchase at that time due to its insensitive and distasteful content. Peculiarly enough, Mr. Botti did not actually see or examine or evaluate a copy of the game until nearly a year after the letter went out, i.e., not until September 1981, and made no effort to obtain a copy of the game in the interim to see for himself. Parenthetically, as a matter of fact, Brentano in the following year, in 1981, changed its viewpoint and did carry the game.

No other recipient of the letter testified that he felt intimidated or threatened. Correspondence from recipients indicates that the game was either rejected before receipt of the Brezenoff letter or that the retailers felt that any decision concerning what was proper for them to sell was theirs alone to make.

Apparently, the defendant chose the wrong audience for his letters. Plaintiffs' expert, Mr. Dunnigan, testified that only two of the stores, Brentano and F.A.O. Schwartz carry games that are comparable [5] to "Public Assistance". Both of those stores stated that they had decided to reject the game before receiving the letter; moreover, both stores ultimately decided to carry the game in 1981.

The fact that the letter was on official Human Resources stationery does not appear to have intimidated any recipients, nor should it have. All of the letter's recipients are major retailers and except for speculation uttered by plaintiffs, there is no evidence that such retailers feel threatened easily. Human Resources had no function or authority to regulate any aspect of the business of retail stores. The defendant made no attempt to communicate with or enlist any City agency which did have authority to oversee or regulate the recipients of the letter. While there was testimony that the New York City Fire Department chose to make safety code inspections in December 1980 around Christmas shopping times, there is no evidence that connected those inspections in any way whatsoever as an ulterior threat or related them to the game in question. They were not improper. The City's inspections were not in response to or in support of the Brezenoff letter. Neither the licensing power nor the health and safety inspection power of the City of New York were shown to be associated with or supportive of the Brezenoff letter in any way.

---

**5.** A comparable game would be an adult game addressing a political or social issue.

Finally, it would be at best speculative to conclude that any store in New York or elsewhere that did not carry the game, and was somehow connected with one of the letter's recipients, refused to carry the game because of the letter. The Court is convinced that if there were decisions of retailers made not to carry the game,[6] those decisions were made either in response to the on-going notoriety and general public controversy surrounding the game or due to the store's own standards of propriety and good taste. There is no evidence impliedly or specifically linking any decision to reject the game to the Brezenoff letter.

### IV. Libel

■ Plaintiffs' demand for compensation from defendant Brezenoff for libel is utterly devoid of merit and borders on frivolity. The prima facie requirements of proof of libel were not met. The letter is not libelous per se, it does not tend to injure the plaintiffs in their business nor does it impute to them a quality which would be detrimental to their trade. *See Bordoni v. New York Times Co., Inc.*, 400 F.Supp. 1223, 1227 (S.D.N.Y.1975). The letter as a whole, given its plain and ordinary meaning, does not libel the plaintiffs whatsoever. *Id.* Moreover, there was no proof of falsity, the absence of which is a complete bar to recovery. *Rinaldi v. Holt, Rinehart & Winston, Inc.*, 42 N.Y.2d 369, 381, 397 N.Y.S.2d 943, 950, 366 N.E.2d 1299, 1306, *cert. denied*, 434 U.S. 969, 98 S.Ct. 514, 54 L.Ed.2d 456 (1977).

■ Plaintiffs would not be entitled to recover on the basis of a letter of this character in any event because the defendant was fully entitled to state his honestly held opinion. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 329, 94 S.Ct. 2997, 3001, 41 L.Ed.2d 789 (1974); *Yiamouyiannis v. Consumers Union of the United States, Inc.*, 619 F.2d 932, 941 (2d Cir.), *cert. denied*, 449 U.S. 839, 101 S.Ct. 117, 66 L.Ed.2d 46 (1980). Opinions are protected even when they con-

tain emotionally charged or inflammatory rhetoric. *Cf. NAACP v. Claiborne Hardware Co.*, —— U.S. ——, ——, 102 S.Ct. 3409, 3433, 73 L.Ed.2d 1215 (1982) (constitutional protection applies to emotionally charged speech). Since the letter sets forth the facts that are the basis of the opinion, it is fully protected and not libelous. *Rinaldi v. Holt, Rinehart & Winston, Inc.*, 42 N.Y.2d at 382, 397 N.Y.S.2d at 950, 366 N.E.2d at 1306.

■ The plaintiffs' scurrilous and scathing attack on the welfare system and the beneficiaries thereof entitled, if not required, a response from a public official under the common law right of retort. *Cf. Duffy v. Kipers*, 26 A.D.2d 127, 271 N.Y.S.2d 338 (4th Dept.1966) (a criticized public official may respond with or initiate defamatory statements in the course of his official duties). Similarly, fair comment on the attack is fully privileged. *See Julian v. American Business Consultants*, 2 N.Y.2d 1, 7, 155 N.Y.S.2d 1, 7, 137 N.E.2d 1, 6 (1956).

In contrast to plaintiffs' unabashed criticism of the welfare system and its beneficiaries, the letter's response was restrained and fair in every sense.

The right to respond to the game's allegations is not diluted by the defendant's status as a government official. Public servants are entitled to express their legitimately held opinions and have every right to speak out in the face of criticism they deem to be unfounded. *See First National Bank v. Bellotti*, 435 U.S. 765, 777, 98 S.Ct. 1407, 1416, 55 L.Ed.2d 707 (1978); *Grower v. State*, 23 A.D.2d 506, 255 N.Y.S.2d 135 (3d Dept.1965), *aff'd* 19 N.Y.2d 625, 278 N.Y.S.2d 408, 224 N.E.2d 899 (1967).

■ Indeed, the defendant's administrative status renders him immune from liability for damages resulting from a claim of defamation. *See Barr v. Matteo*, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434

---

**6.** There is some indication that Macy's ordered the game and subsequently cancelled its order and returned the merchandise. It appears that the game never actually reached the sales floor and the reasons for the returns were not ad- duced from or on behalf of Macy's, whether it was received too late for the holiday sales, or because of the controversy over the game, or for whatever other reason.

(1959); *Expeditions Unlimited Aquatic Enterprises, Inc. v. Smithsonian Inst.,* 566 F.2d 289 (D.C.Cir.1977), *cert. denied,* 438 U.S. 915, 98 S.Ct. 3144, 57 L.Ed.2d 1160 (1978). Absolute immunity attaches when the government official acts, as here, within the scope of his official subject matter. The immunity is applicable to actions for claimed damage due to libel and is absolute for a municipal officer since libel is not a constitutional tort. *See Barr v. Matteo,* 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959); *C.M. Clark Ins. Agency, Inc. v. Maxwell,* 479 F.2d 1223, 1227 (D.C.Cir.1973).

■ In addition to absolute immunity as a public official, defendant also is protected by a qualified common law privilege to communicate with individuals who have an interest in the subject matter. *See Clark v. McGee,* 49 N.Y.2d 613, 621, 427 N.Y.S.2d 740, 745, 404 N.E.2d 1283, 1287 (1980). Communications with potential distributors of a controversial game are protected by this privilege. *Cf. Shapiro v. Health Ins. Plan,* 7 N.Y.2d 56, 60, 194 N.Y. S.2d 509, 512, 163 N.E.2d 333, 335–36 (1959) (privilege exists even if there is no legal duty to communicate). Damage to commercial interests does not defeat the privilege. *Zito v. American Federation of Musicians,* 60 A.D.2d 967, 401 N.Y.S.2d 929 (4th Dept.1978). Moreover, common law privilege is not contingent on broad publication of speaker's views. *See, e.g., Commonwealth Motor Parts v. Bank of Nova Scotia,* 44 A.D.2d 375, 355 N.Y.S.2d 138 (1st Dept. 1974), *aff'd* 37 N.Y.2d 824, 377 N.Y.S.2d 482, 339 N.E.2d 888 (1975).

■ The common law qualified privilege to communicate can only be overcome by a showing of common law "actual malice". Unlike constitutional "actual malice", *infra.,* plaintiffs need only show ill-will or culpable recklessness or negligence. *See Perfect Fit Indus. v. ACME Quilting Co.,* 494 F.Supp. 505, 507 (S.D.N.Y.1980). The defendant's actions show no ill-will nor were they reckless or negligent; his qualified common law privilege protects him against a claim of libel.

■ Recovery by plaintiffs is further barred by their failure to prove "actual malice" as required by *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Proof of actual malice—that the defendant knew his statements were false or that he spoke in reckless disregard of the truth—is constitutionally required when the libelled plaintiff is a public official or a public figure. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

■ By injecting themselves into the welfare controversy for profit and to influence the resolution of the issue, the plaintiffs became public figures with respect to criticism of their welfare views. *Id. Gertz* does not require that plaintiffs' sole or dominant purpose be to influence the controversy. When they injected their criticisms of the welfare system into the public forum by marketing and publicly promoting and exploiting their game, they created a constitutionally based protection for those who sought to rebut those criticisms. Plaintiffs had and employed substantial media access during this period to shape the public debate and were therefore prototypical limited purpose public figures.

Plaintiffs attempt to escape the *New York Times* requirement by defining the controversy as one relating to censorship. Such a limitation would emasculate the constitutional protection that has heretofore been required. In effect, plaintiffs' position is that whenever a party enters a medium to express an idea, no matter how scurrilous, distasteful or bogus, an individual who attacks that idea by criticizing its publication has created a brand new controversy—a censorship controversy.

Cases relied on by plaintiffs are inapposite. Mr. Brezenoff did not lift the plaintiffs out of obscurity and thrust them into the public forum. Thus the case is distinguished from *Hutchinson v. Proxmire,* 443 U.S. 111, 135, 99 S.Ct. 2675, 2688, 61 L.Ed.2d 411 (1979) (Senator Proxmire's award of "Golden Fleece" to a relatively unknown scientist). Nor was the defendant resurrecting an ancient controversy against

plaintiffs' desires. *See Wolston v. Readers Digest,* 443 U.S. 157, 167–68, 99 S.Ct. 2701, 2707, 61 L.Ed.2d 450 (1979). Finally, plaintiffs were not dragged unwillingly into a "cause celebre," *see Time, Inc. v. Firestone,* 424 U.S. 448, 454, 96 S.Ct. 958, 965, 47 L.Ed.2d 154 (1976) (prominent woman's divorce proceedings incorrectly characterized), rather they hoped for, profited from, and encouraged controversy.

The *New York Times* actual malice standard has not been expressly limited to cases involving media defendants. *Hutchinson,* 443 U.S. at 133 n. 16, 99 S.Ct. at 2687 n. 16 ("This Court has never decided the question"). Moreover, the *New York Times* standard has been employed on behalf of non-media defendants even though the issue was not explicitly decided. *See, e.g., St. Amant v. Thompson,* 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968) (candidate for public office); *Garrision v. Louisiana,* 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964) (district attorney).

■ Finally, the defendant is entitled to constitutional protection even though he expressed his views in the form of a letter. There is no requirement that a defendant seek broad public circulation of his views in order to be protected by *New York Times v. Sullivan. See Adey v. United Action for Animals, Inc.,* 361 F.Supp. 457, 461–62 (S.D. N.Y.1973), *aff'd,* 493 F.2d 1397 (2d Cir.1974), *cert. denied,* 419 U.S. 842, 95 S.Ct. 74, 42 L.Ed.2d 70 (1974). *See also Givhan v. Western Line Consolidated School Dist.,* 439 U.S. 410, 413, 99 S.Ct. 693, 695, 58 L.Ed.2d 619 (1979). Thus, in order to recover for libel, plaintiffs must demonstrate actual malice on the part of the defendant. This has not been proven; therefore no recovery for libel can be had.[7]

## V. Interference with Contractual and Commercial Relations

[13–15] Plaintiffs have failed to establish prima facie proof that the defendant interfered with their contractual relationships or with their advantageous business relations. The elements needed to prove a claim of tortious interference with an alleged contract include proof of the existence of a valid contract, defendant's knowledge of that contract, defendant's intentional procuring of the breach of the contract and damages. *Wegman v. Dairylea Cooperative, Inc.,* 50 A.D.2d 108, 376 N.Y. S.2d 728 (4th Dept.1975). The elements needed to prove a claim of interference with an advantageous business relationship include proof that the defendant acted solely out of malice with the intention of harming plaintiff's business. *See Shapiro v. Prudential Insurance Co.,* 81 A.D.2d 661, 438 N.Y.S.2d 363 (2d Dept.1981); *Rosenberg v. Del-Mar Division, Champion Int'l Corp.,* 56 A.D.2d 576, 391 N.Y.S.2d 452 (2d Dept. 1977).

None of those elements have been proven. There is no proof that valid contracts existed between the plaintiffs and retailers. Apparently retailers could ask for as many games as they desired and could return games if they chose not to sell them. There was no evidence that the defendant had an idea which stores had been approached by the game's marketers in the year in question. The Brezenoff letter did not call for retailers to breach otherwise valid contracts and there was no proof that any retailer breached a valid contract and damaged plaintiffs as a result of the letter.

The defendant, as already stated above, did not act out of malice or with the sole intention of harming the plaintiffs. He acted in his own legitimate self interest and for the interests of welfare recipients and

---

7. As it must, New York law incorporates the constitutional protections for free speech. In libel cases New York expands the protection established in *New York Times* to cases involving private individuals where the matter under discussion is of public concern. *See Chapadeau v. Utica Observer-Dispatch, Inc.,* 38 N.Y.2d 196, 199–200, 379 N.Y.S.2d 61, 63–64, 341 N.E.2d 569, 571–72 (1975). In a case in-

volving issues of public concern, a plaintiff must show that the defendant acted in a grossly irresponsible manner. *Id.* Thus, even if plaintiffs were not public figures for the purposes of the welfare controversy they could not recover under New York law. Plaintiffs suggest that *Chapadeau* should be limited to media defendants; for the reasons discussed above, the Court declines to do so.

administrators. Those legitimate goals leave his actions within the scope of the common law privilege to interfere with contracts or businesses when acting in one's own legitimate self interest. *See, e.g., Felsen v. Sol Cafe Mfg. Corp.,* 24 N.Y.2d 682, 301 N.Y.S.2d 610, 249 N.E.2d 459 (1969).

Plaintiffs are not entitled to prevail herein for yet another reason; the defendant is immune from a claim of interference with contracts or businesses because he was acting within the scope of the subject matter of his official duties. For the reasons expressed above with respect to the claim of libel, a valid claim does not exist here, as well. *See Expeditions Unlimited Aquatic Enterprises, Inc. v. Smithsonian Inst.,* 566 F.2d 289 (D.C.Cir.1977), *cert. denied,* 438 U.S. 915, 98 S.Ct. 3144, 57 L.Ed.2d 1160 (1978) (absolute immunity attaches even where defendant sends a letter that is critical of a business).

Finally, Mr. Brezenoff's constitutional protections of free speech entitle him to engage in public debate even if business interests are affected. *See NAACP v. Claiborne Hardware Co.,* —— U.S. ——, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982); *Organization for a Better Austin v. Keefe,* 402 U.S. 415, 419, 91 S.Ct. 1575, 1577, 29 L.Ed.2d 1 (1971).

## VI. Interference with Free Speech and Press—Censorship

■ Plaintiffs assert yet another claim, viz., that Brezenoff's criticism of their game constitutes governmental censorship. This contention demonstrates a complete misunderstanding of the protections afforded to all speakers—private and public—by the Constitution. A public official does not lose his unfettered right to express his opinion in non-defamatory words concerning the critical comments of zealots and others exercising like privileges by deed and word. The contra would put a silencer on the elected and selected leaders of the body politic. The Brezenoff letter was not censorship; it was an appeal to conscience and decency. The parties stipulated in their joint statement of facts that "Commissioner

Brezenoff had the responsibility to express agency policy on social service issues and generally to inform the public concerning the programs of his agency".

Plaintiffs rely on *Bantam Books v. Sullivan,* 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1962) which interdicts informal governmental efforts to censor. *Bantam Books* is distinguished in a number of respects. There, the offending letter was written by the Commission to Encourage Morality in Youth, a body whose purpose was to inform vendors what material it was improper to sell. The letter suggested that prosecuting agencies would check-up and follow-up. In contrast, there was no threatened or actual follow-up to the Brezenoff letter; the lack thereof defeats a claim of censorship.

Additional cases cited by plaintiffs are equally inapplicable. In *Bonner-Lyons v. School Committee,* 480 F.2d 442 (1st Cir. 1973), the defendant was engaged in disseminating literature to a captive school audience where those with opposing views had no opportunity to reach the same audience. The plaintiffs could, and in fact did, write letters to the recipients of the Brezenoff letter. Significantly, if the letter had any impact, it was to increase the opportunities of the plaintiffs to express their views in the media. In *State Cinema v. Ryan,* 422 F.2d 1400 (1st Cir.), *cert. denied,* 400 U.S. 850, 91 S.Ct. 51, 27 L.Ed.2d 87 (1970), the informal warning by the police and prosecutor threatened subsequent arrest and prosecution and is therefore irrelevant to the actions of the defendant, Mr. Brezenoff.

Plaintiffs also rely on *Selfridge v. Carey,* 522 F.Supp. 693, 697 (N.D.N.Y.), *aff'd* 660 F.2d 516 (2d Cir.1981) to suggest that the defendant had an affirmative duty to protect the plaintiffs' right to sell the game. In *Selfridge,* the Court held that the state could not cancel a rugby match involving South African players because it feared that violence would result. Unlike the visiting South Africans, the plaintiffs had numerous outlets for their games and their views and were in no way impeded from hawking either.

■ Even if the defendant had been engaged in censorship, he would have been protected by a qualified privilege with respect to a claim for damages resulting from his actions in his official area as long as he acted in good faith. *See, e.g., Wood v. Strickland,* 420 U.S. 308, 321, 95 S.Ct. 992, 1000, 43 L.Ed.2d 214 (1975).

*VII. Conclusion*

None of the theories of claim put forth by plaintiffs were supported by a fair preponderance of credible proofs or have legal merit.

Accordingly, the complaint and all the claims of the plaintiffs in this action are hereby dismissed on the merits, with costs.

The foregoing shall constitute the findings of fact and conclusions of law required by Rule 52(a) of the Federal Rules of Civil Procedure.

SO ORDERED.